STATE OF NORTH CAROLINA v. JAMES ERNEST BRUNSON

No. 71

(Filed 6 June 1975)

1. Criminal Law § 87— leading question

The trial court in this first degree murder case did not abuse its discretion in allowing the district attorney to ask the State's principal witness a leading question as to whether the witness could have left his house at 7:30 a.m. rather than at 7:15 a.m.

2. Criminal Law § 62— polygraph test results

The trial court in a first degree murder case properly excluded testimony as to the results of a polygraph test administered to defendant.

3. Homicide § 25— answer to jury foreman's question — meaning of cool blood — cold blooded killing

In this first degree murder prosecution, answer of the trial judge to a question of the jury foreman that a "cold blooded" killing

State v. Brunson

means about the same thing as killing in cool blood, while disapproved, did not constitute prejudicial error where the court properly instructed the jury on premeditation and deliberation on at least three occasions; furthermore, the trial judge's answer could not have affected the result in view of the viciousness of the assault which resulted in the death of the child in this case.

4. **Homicide § 31— first degree murder — life imprisonment**

The trial court properly imposed a sentence of life imprisonment upon defendant's conviction of first degree murder committed prior to 18 January 1973, the date of the decision in *State v. Waddell,* 282 N.C. 431.

APPEAL by defendant pursuant to G.S. 7A-27 (a) from *Hobgood, J.,* at the September 9, 1974 Criminal Session of CUMBERLAND Superior Court.

Defendant is charged in a bill of indictment, proper in form, with the first degree murder of Vanessa Dale Lewis on 22 February 1972. He was first tried at the 22 October 1973 Session, Cumberland Superior Court, convicted by a jury and sentenced to life imprisonment. He appealed to this Court and was awarded a new trial for the reasons stated in that opinion. 285 N.C. 295, 204 S.E. 2d 661 (1974).

At his retrial, upon a plea of not guilty, he was again convicted of first degree murder and again sentenced to life imprisonment.

The State's evidence may be summarized as follows:

On 22 February 1972, Mrs. Annie Lorene Houston lived on VanStory Street in Fayetteville. At approximately 8:20 a.m., Vanessa Dale Lewis, age nine, came by Mrs. Houston's house in order to walk to school with Mrs. Houston's grandchildren. Mrs. Houston told Vanessa that her grandchildren had left about five minutes earlier and Vanessa ran to catch them.

Between 8:00 and 9:00 a.m. on the morning of 22 February, Mr. Marvin McGathy was searching for his dog in the vicinity of a burned house on Buxton Boulevard where he had once lived. He entered the house and discovered Vanessa Dale Lewis lying on a table in the kitchen. Vanessa's face was very bloody, and her clothes and books were lying in another part of the kitchen. Vanessa made a slight noise. Mr. McGathy then went to his daughter's house nearby and called the police.

Mr. W. A. Newsom, a detective with the Fayetteville Police Department at the time of the crime, received a call at 9:30

a.m. on 22 February 1972, and he and another officer went with Mr. McGathy to the burned house. When they arrived Vanessa was still alive but unconscious. Vanessa's skull was crushed on both sides and her brain was exposed. Her nose was broken, both eyes were swollen shut, her upper front teeth were missing, and her vaginal area was exposed and bleeding. There were blood spots on a nearby cabinet and stove. Vanessa was wearing only a coat, sweater-type blouse, skirt and slip. The slip and skirt had been pushed up so that Vanessa was exposed from her waist down. Her back and head were on top of the coat. An ambulance arrived at the scene of the crime within five minutes after the arrival of Detective Newsom and took Vanessa to Cape Fear Valley Hospital.

Detective Newsom found some tracks in front of the house which appeared to have been made by the boots worn by Vanessa on the day of the crime. In close proximity to these tracks were others made by tennis shoes which followed Vanessa's tracks across the yard to the house. A bloodhound led officers to some very thick undergrowth about forty yards from the house where a hammer with fresh blood on it was found suspended in a bush. The bloodhound then led officers through the underbrush to the rear of a nearby church.

Dr. Richard Dean Snipes was on duty at about 10:30 a.m. on 22 February when Vanessa was received at Cape Fear Valley Hospital. She never regained consciousness and died about thirty minutes after her arrival from massive injuries to the head resulting from blows with a blunt instrument.

Due to the extremely dirty condition of the scene of the crime no fingerprints were found; neither were any fingerprints found on the hammer.

Mr. Glen Glesne, employee of the State Bureau of Investigation Crime Laboratory, found blood, group "O," on some of the items of clothing worn by Vanessa and on the hammer. Vanessa's blood was group "O."

On 22 February 1972, Robert Carmichael awoke about 7:00 a.m., had breakfast, and went to defendant's home. Defendant's sister, Melissa Brunson, answered the door. Carmichael and defendant discussed how they were going to get money to go to a basketball game, and decided they would get copper wire from deserted houses in the area and sell it as they

had in the past. They returned to Carmichael's house and procured a hammer and screwdriver. Carmichael identified the hammer in evidence as being the hammer they took from his house on 22 February. Defendant was wearing tennis shoes that morning.

They were unsuccessful in their search for copper at the first three houses they examined. They then went toward the old burned house on Buxton Boulevard with hopes of finding copper there. On the way, they encountered Vanessa Dale Lewis walking in the direction of her school. Defendant walked beside her and began talking to her and Carmichael followed about six feet behind. The three of them went to the burned house and Carmichael proceeded to look for copper under the house. When Carmichael looked up, defendant and Vanessa, who were inside the house, were talking and then defendant began hugging her. Defendant helped Vanessa take off some of her clothes and attempted unsuccessfully to have intercourse with her. Vanessa tried for about thirty seconds to push defendant off of her. Defendant then picked up the hammer and hit her in the head. When Vanessa began screaming, defendant hit her hard about the head four or five times. Blood "began going a little bit everywhere," and some splattered on defendant and Carmichael. Defendant and Carmichael then ran out the door and through the woods, and emerged at the back of a church located nearby. Carmichael did not notice what happened to the hammer.

Defendant and Carmichael went to defendant's home nearby and tried to remove the blood. Defendant's brother, Lee Junior Brunson, was there. When he asked them how they got blood on them, defendant answered they had been killing hogs. After changing clothes, defendant and Carmichael went to Spivey Junior High School where they were students. They arrived about fifteen minutes late.

At this point, the State introduced the statement in open court that Robert Carmichael was granted full immunity in this case.

According to Lee Junior Brunson, defendant and Robert Carmichael entered the house about 8:30 to 8:45 a.m. on 22 February 1972 and both had blood on them. He saw them go into the bathroom and heard water running, and noticed that when they returned downstairs they had changed clothes and had the clothes with blood on them in a bag. Defendant and

Carmichael were there ten or fifteen minutes at the most. Lee Junior admitted on direct examination that the first time he was interviewed about this case he told officers his brother *Leon* was the one who entered the house with blood on his clothes on the morning of 22 February. He misled the officers because he did not think they would be able to locate Leon.

Mr. W. A. Newsom was recalled and testified that he first learned there may have been two persons involved in the murder when he interviewed Lee Junior Brunson on 7 May 1973. Detective Newsom then interviewed defendant on 9 May 1973 at Stonewall Jackson Training School, Concord, North Carolina, where defendant was being held on other charges. When Detective Newsom handed defendant the hammer, defendant "appeared to be in a state of shock," but did not say anything. Detective Newsom interviewed Robert Carmichael for the first time on 10 May 1973.

On 11 June 1973, Detective Newsom again interviewed Robert Carmichael and procured a statement which was introduced to corroborate Carmichael's testimony at trial. Later the same evening, Detective Newsom and Agent Ray Davis again interviewed defendant. Immediately after defendant was informed of his rights, he said he knew exactly what happened, but would say no more. The officers placed defendant in an automobile and returned to Fayetteville. At one point during the trip, defendant said, "I did it, but you will have to prove it."

Mr. Ray Davis, Assistant Supervisor of the Southeastern District of the State Bureau of Investigation, corroborated this testimony of Detective Newsom.

Defendant's evidence was, in summary:

Robert Carmichael was recalled, and testified that subsequent to his testimony the preceding day he visited his brother James at the county jail. Thereafter, he informed the District Attorney that Lee Junior Brunson and not defendant killed Vanessa Dale Lewis. However, Carmichael then testified as follows:

"Q. All right, Robert Carmichael, tell this Court now, before the people of this State, who killed Vanessa Dale Lewis on the 22nd day of February, 1972?

\*      \*      \*

"A. James Ernest Brunson."

Of the next four witnesses for defendant, two were police officers and two were investigators for the Public Defender's Office, and their testimony served to corroborate Carmichael's testimony that at one point on the preceding day he told the District Attorney that Lee Junior Brunson, and not defendant, killed Vanessa Dale Lewis.

On 22 February 1972, Lee Junior Brunson was supposed to be Miss Catherine Johnson's boyfriend. At about 7:10 a.m. on that day, she went to his house and lay down in his bed. Lee Junior left to get a soda about 8:00 a.m. He came back about 9:00 to 9:15 a.m., took off his tennis shoes and threw his shirt, which was balled up, under the dresser. He then went into the bathroom for five or ten minutes. At no time did she see James Brunson leave or return to the house. She left about 1:30 p.m. She testified that she has had telephone conversations with Lee Junior since he joined the Marines, and on two or three occasions when she asked him if he killed Vanessa Dale Lewis he would hang up.

A statement made by Miss Johnson to the investigator at the Public Defender's Office on 29 November 1973 was introduced in corroboration of her testimony.

On 22 February 1972, Lee Junior Brunson was also supposed to be Miss Jacqueline Armstrong's boyfriend. She received letters from him after he entered the Marines and on the envelopes of two of them he had drawn small "doodles." The jurors were allowed to inspect these envelopes so they could compare the doodles on the envelopes to a "doodle" found drawn on the body of the victim, Vanessa Dale Lewis.

Defendant next introduced the stipulation that the records of the central office of the Fayetteville City Schools show that neither defendant nor Robert Carmichael was marked "absent" or "tardy" at school on 22 February 1972.

James Brunson, the defendant, testified that he went to school with "one of the Carmichaels" about 7:45 a.m. on the morning of 22 February 1972, but he was uncertain which one. He and "Carmichael" separated before they got to school; "Carmichael" went "on down the tracks" and defendant went to school. He had breakfast at school, smoked a cigarette with James Carmichael, and played basketball with James Carmichael and Charles Davis until the first bell rang at 8:25 a.m. He did not own a pair of basketball or tennis shoes on that date. He

testified that he was manager of the junior high basketball team and could go to the games free. He was working part-time six days a week at a gas station nearby. He was not at the burned house on Buxton Boulevard on 22 February 1972 and at no time struck Vanessa Dale Lewis with a hammer. He did not at any time tell police officers: "I know what happened. I did it. Prove it."

James Carmichael testified that he ate breakfast, smoked a cigarette and played basketball with defendant and Charles Davis on 22 February 1972, and that his brother, Robert Carmichael, told him earlier that defendant did not kill Vanessa Dale Lewis.

Charles Davis ate breakfast, smoked a cigarette and played basketball with defendant and James Carmichael on 22 February 1972. He loaned defendant his sneakers for gym class because defendant had none. He heard Robert Carmichael tell James Carmichael that defendant did not kill Vanessa Dale Lewis.

Mrs. Carmichael, mother of Robert and James Carmichael, did not see Robert or defendant come back to the house after Robert left on the morning of 22 February 1972. She did not recall having seen a hammer like the one in evidence around the house at any time.

The State's rebuttal evidence was, in summary:

Minnie Pearl Brunson, sister of defendant, testified that she let "a Carmichael boy" in the house before 8:00 a.m. on 22 February 1972.

On 9 May 1973, defendant told Mr. Ray Davis that *Robert* Carmichael came to his house on the morning of 22 February. Defendant also told Davis that he did not see James Carmichael on that day.

Mr. W. A. Newsom was recalled and stated that at the former trial James Carmichael testified that he went to school with defendant on the morning of 22 February 1972.

Additional facts necessary for decision are set forth in the opinion.

*Attorney General Rufus L. Edmisten and Assistant Attorney General Thomas B. Wood for the State.*

*Sol G. Cherry for defendant appellant.*

MOORE, Justice.

[1] Defendant's first assignment of error is based on his Exception No. 2. By this assignment defendant contends that the court erred in allowing the assistant district attorney to repeatedly ask Robert Carmichael leading questions, particularly with reference to the time he left home on the morning of the murder.

Robert Carmichael testified on cross-examination that he awoke at approximately 7:00 a.m. and arrived at defendant's at approximately 7:15 a.m.; that he based that on the fact that his brothers left about five minutes earlier than he every day; that he did not have a watch; and that he "really didn't know" what time he left. He was then asked by the assistant district attorney on redirect examination:

"Q. All right, did you in fact then base your time estimate to start with—

"MR. CHERRY: Object to leading, your Honor.

"COURT: SUSTAINED.

"Q. Is that the only basis on which you estimate that you left your house about seven fifteen?

"A. Yes.

"Q. Could it have been seven-thirty that you left your house?

"MR. CHERRY: Objection. Move to strike.

"A. Yes.

"COURT: OVERRULED. DEFENDANT'S EXCEPTION No. 2."

Only three questions were asked. The trial court sustained the objection to one of these. No objection was made to the second, so only the third question forms the basis for this assignment.

The record discloses that the witness was not sure of the time he left the house, and the assistant district attorney was

simply trying to clarify this. Defendant himself testified that he got up about 7:30 a.m. and that a Carmichael boy came by while he was dressing. In view of this testimony by defendant, we do not see how he could have been prejudiced by Robert Carmichael's answer that he could have left his home at 7:30 a.m. rather than 7:15 a.m.

Furthermore, this Court has wisely and almost invariably held that the presiding judge has wide discretion in permitting or restricting leading questions. When the testimony so elicited is competent and there is no abuse of discretion, defendant's exception thereto will not be sustained. 2 Wharton's Criminal Evidence § 412 (13th ed. 1972); *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974); *State v. Bass*, 280 N.C. 435, 186 S.E. 2d 384 (1972); *State v. Clanton*, 278 N.C. 502, 180 S.E. 2d 5 (1971); *State v. Painter*, 265 N.C. 277, 144 S.E. 2d 6 (1965); *State v. Pearson*, 258 N.C. 188, 128 S.E. 2d 251 (1962). We hold that, in allowing the single leading question here presented, the trial court did not abuse its discretion.

[2] During the course of the trial defendant offered as a witness Mr. Charles Whitman, a Special Agent with the North Carolina State Bureau of Investigation. His testimony was taken out of the presence of the jury. Mr. Whitman testified that he is a polygraph examiner with the State Bureau of Investigation and recited in detail his qualifications for such position. He further testified that he saw defendant on 2 April 1974 in Morganton, North Carolina, and at the request of Captain Studer of the Fayetteville Police Department administered a polygraph examination to defendant. He testified regarding the procedures he followed and the results of the examination. The trial court ruled this testimony inadmissible.

Defendant's counsel in his brief states: "It is readily conceded that the present rule in North Carolina and the majority of jurisdictions is that the results of a polygraph examination may not be used in Court to show either innocence or guilt. . . . " Defendant, however, contends that in this case a proper foundation was laid for the admission of this testimony in that defendant voluntarily submitted to the polygraph test, the test was administered by a competent qualified examiner, and the results of the test would have been beneficial to defendant's case, and that the exclusion of this evidence was therefore prejudicial error.

State v. Brunson

In *State v. Foye*, 254 N.C. 704, 120 S.E. 2d 169 (1961), we held such evidence inadmissible. Chief Justice Winborne there reviewed the authorities from other jurisdictions stating various reasons why results of such tests were not admissible and then concluded:

" . . . [W]e are of opinion that the foregoing enumerated difficulties alone [lack of general scientific recognition, tendency to distract the jury, inability to cross-examine machine, no corresponding necessity for submission to tests by the prosecution] in conjunction with the lie detector use presents obstacles to its acceptability as an instrument of evidence in the trial of criminal cases, notwithstanding its recognized utility in the field of discovery and investigation, for uncovering clues and obtaining confessions. This conclusion is in line with the weight of authority repudiating the lie detector as an instrument of evidence in the trial of criminal cases."

Defendant urges us to reconsider our decision in *Foye* in light of technological and judicial advances since *Foye* was decided in 1961. The weight of authority still supports that decision. *See* Annot., 23 A.L.R. 2d 1306 (Later Case Service 1970 and Later Case Service 1975) ; 29 Am. Jur. 2d, Evidence § 831 (1967). We see no compelling reason to change our ruling and we adhere to our decision in *Foye* for the reasons stated therein.

The jury, after having deliberated for some time, returned into court and asked the trial judge to again explain the difference between first degree and second degree murder. The trial judge did so, and defendant's counsel concedes that the trial judge's initial and supplemental charges with reference to the various elements of first and second degree murder were correct.

[3] After the supplemental charge, the jury again returned and asked the trial judge for a "couple" of definitions:

"One is what is the meaning of cool blood or cold blood, and the other one you have already stated two or three times, but we need it one more time, I guess, and that is the time limit in premeditated and deliberate deliberation, whatever it may be."

The trial judge then repeated that portion of his charge which correctly defined premeditation and deliberation.

The foreman of the jury then asked for a definition of cool blood. The court gave an acceptable definition of cool blood, to which defendant did not object. The foreman then said:

"Sir, could I ask one more question?

"COURT: All right.

"FOREMAN: Would this be what in my time and in my years past we have heard as a cold blooded killing, is that what it would mean, about the same thing?

"EXCEPTION    DEFENDANT'S EXCEPTION NO. 17.

"COURT: Yes, sir.

"FOREMAN: Thank you, sir."

Defendant assigns this answer as error. While we do not approve this answer, and the trial judge would have been well advised to have reminded the jury that he had explained the meaning of cool blood, and to have referred to and if necessary repeated that explanation, we do not believe this answer is so prejudicial as to require a new trial. The charge of the court must be construed contextually and segregated portions will not be held prejudicial error when the charge as a whole is free from objection. *State v. Bailey,* 280 N.C. 264, 185 S.E. 2d 683 (1972); *State v. Alexander,* 279 N.C. 527, 184 S.E. 2d 274 (1971); *State v. McWilliams,* 277 N.C. 680, 178 S.E. 2d 476 (1971); *State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593 (1969). *See* 3 Strong, N. C. Index 2d, Criminal Law § 168 (1967).

In *State v. Sanders,* 276 N.C. 598, 615-16, 174 S.E. 2d 487, 499-500 (1970), we said:

" . . . Premeditation means 'thought beforehand' for some length of time, however short. [Citation omitted.] This Court said in *State v. Benson,* 183 N.C. 795, 111 S.E. 869: 'Deliberation means . . . an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design . . . or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation.' [Citations omitted.] No fixed amount of time is required for the mental processes of premeditation and deliberation constituting an element of the offense of murder in the first degree, it being sufficient if these mental processes

occur prior to, and not simultaneously with, the killing. [Citations omitted.]"

The instructions given by the trial judge to the jury on the question of premeditation and deliberation on at least three occasions were in substantial accord with these well settled principles of law. *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974) ; *State v. Sanders, supra.* The answer of the trial judge to the question of the foreman of the jury that "cold blooded" means *about* the same thing as killing in *cool* blood is manifestly not repugnant to the prior instructions. Hence, we are not presented with a situation where the judge gave conflicting instructions on a material point. *Compare State v. Starnes,* 220 N.C. 384, 17 S.E. 2d 346 (1941) ; *State v. Bush,* 184 N.C. 778, 114 S.E. 831 (1922).

To warrant a new trial it should be made to appear that the ruling complained of was material and prejudicial to defendant's rights and that a different result would have likely ensued. *State v. Sanders, supra; State v. Paige,* 272 N.C. 417, 158 S.E. 2d 522 (1968) ; *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364 (1963) ; *State v. Beal,* 199 N.C. 278, 154 S.E. 604 (1930). In view of the viciousness of the assault, which resulted in the death of the child in this case, we do not think that the trial court's answer to the question posed by the foreman affected the result. This assignment is overruled.

[4]  In *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973), we held that due to the decision of the Supreme Court of the United States in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972), the " . . . mandatory death penalty for . . . murder in the first degree . . . may not be constitutionally applied to any offense committed prior to the date of this decision but shall be applied to any such offense committed after such date." *Waddell* was decided 18 January 1973. The murder in the present case was committed on 22 February 1972. Hence, on the jury's verdict of guilty of murder in the first degree, the trial court correctly imposed judgment that defendant be imprisoned for the term of his natural life.

There were many discrepancies and contradictions in the testimony. For example, Robert Carmichael, principal witness for the State, at one time said that defendant did not kill Vanessa Dale Lewis, and that Lee Junior Brunson did. Lee Junior Brunson at one time told the officers that it was his brother

Leon rather than James who came to the house with ·blood on his clothes. Such discrepancies and contradictions go to the credibility of the witness and not necessarily to the competency of the testimony. We are mindful of the fact that the jury observed the witnesses as they gave their testimony and that the probative value of their testimony was solely for determination by the jury. Such discrepancies and contradictions in the State's evidence are matters for the jury and not the court. *Sneed v. Lions Club*, 273 N.C. 98, 159 S.E. 2d 770 (1968); *State v. Burell*, 252 N.C. 115, 113 S.E. 2d 16 (1960); *State v. Bryant*, 250 N.C. 113, 108 S.E. 2d 128 (1959); *State v. Humphrey*, 236 N.C. 608, 73 S.E. 2d 479 (1952). The jury has resolved any doubts against defendant.

After a full and careful review, we conclude that defendant has had a trial free from error, and that the judgment imposed should be affirmed. In the record we find no error.

No error.