STATE OF NORTH CAROLINA v. ELMER LEROY PEOPLES, SR.

No. 106PA83

(Filed 28 August 1984)

**1. Criminal Law § 87; Witnesses § 7— incompetency of hypnotically refreshed testimony**

Hypnotically refreshed testimony is too unreliable to be used as evidence in judicial proceedings. The contrary decision of *State v. McQueen*, 295 N.C. 96, is overruled.

**2. Criminal Law § 87; Witnesses § 7— hypnotized witness—testimony as to facts related before hypnosis**

A person who has been hypnotized may testify as to facts which he related before the hypnotic session, and when a party attempts to offer testimony by a person who has been hypnotized, that party will bear the burden of proving that the proper testimony was related prior to hypnosis. Furthermore, a party proffering the testimony of a previously hypnotized subject is under a duty to disclose the fact of this hypnosis to the court and counsel outside the presence of the jury and before the testimony of the witness.

**3. Criminal Law § 87; Witnesses § 7— incompetency of hypnotically refreshed testimony—retroactivity**

The holding in this case that hypnotically refreshed testimony is inadmissible will apply only to cases which have not been finally determined on direct appeal as of the certification date of this decision. It may not be used as the basis for collaterally attacking any case which has been finally determined on direct appeal or in which no appeal was taken from the trial judgment.

**4. Criminal Law § 87; Witnesses § 7— incompetency of hypnotically refreshed testimony—retroactivity—harmless error rule**

In applying the rule on the inadmissibility of hypnotically refreshed testimony retroactively to all cases which have not been finally determined on direct appeal as of the date on which this opinion is certified, the appellate court will examine each appeal on a case-by-case basis to determine if the error was reversible, *i.e.*, whether a reasonable possibility exists that a different result would have been reached at the trial had the evidence not been erroneously admitted.

**5. Criminal Law § 87; Witnesses § 7— incompetency of hypnotically refreshed testimony and video tape—prejudicial error**

In this armed robbery prosecution, the admission of a witness's hypnotically refreshed testimony and a video tape recording of the hypnotic session constituted prejudicial error since a reasonable possibility exists that a different result would have been reached had this evidence not been admitted at defendant's trial.

ON defendant's petition for discretionary review of a decision by the Court of Appeals, 60 N.C. App. 484, 299 S.E. 2d 311 (1983), affirming defendant's convictions and judgments for armed robbery and conspiracy to commit armed robbery entered by *Judge Robert L. Farmer* at the 7 December 1981 Criminal Session of CUMBERLAND County Superior Court.

*Rufus L. Edmisten, Attorney General, by Fred R. Gamin, Assistant Attorney General, for the state.*

*James R. Parish, Assistant Public Defender, for defendant appellant.*

EXUM, Justice.

The crux of the present case concerns the admissibility of testimony by a witness who undergoes hypnosis prior to testifying. Defendant challenges the trial court's admission of a witness's hypnotically refreshed testimony and of a video tape recording of the hypnotic session. We find error in both rulings and reverse the decision of the Court of Appeals.

I.

In the early morning hours of 26 May 1980, Bruce Crockett Miller participated in the armed robbery of the Borden Chemical Plant in Fayetteville, North Carolina. He, along with two other men, took several buckets of almost pure silver, used by the plant in its manufacture of formaldehyde, valued at over $90,000. Defendant was arrested on 29 April 1981 in connection with the robbery. An eyewitness to the robbery, a shift supervisor at the company whom the perpetrators forced to open the building containing the silver, identified defendant as one of the robbers.

Pursuant to a plea agreement in an unrelated case, Miller testified against defendant who was tried with Robert Peele, the third man involved in the Borden Chemical robbery. Miller out-

lined, in considerable detail, the planning and robbery of Borden Chemical in which he, Peele, and defendant participated. Specifically, he related that defendant, whom Miller had known since high school and had seen occasionally during the ensuing twenty years, called him in April or May 1980; inquired of his interest in making "some easy money"; and arranged a meeting with a third man, Peele. The three men met a number of times to discuss and plan the robbery.

According to Miller, defendant called him at his Raleigh home on 24 May 1980 and told him to come back to Fayetteville. Miller went to defendant's home, and the two men completed plans for the robbery. Defendant told Miller that a large amount of silver was at the plant; that the number of people at the plant was reduced after the shift changed on Sunday evenings; that company policy prohibited guns on the premises; that the shift supervisor's name was Steve; and that, once the alarm sounded, the police could arrive at the plant after no less than five to seven minutes.

On Sunday evening, Miller, defendant, and Peele went to the plant. After the shift changed, Miller, armed with a gun, went to the supervisor's office. He instructed the supervisor to take him to the white building where the silver was kept. They went there and were joined by defendant and Peele. After prying open a second door and triggering an alarm, the men loaded a number of black buckets containing silver into the car. They left the premises.[1] Later they sold some of the silver and divided the remainder and the money among themselves.

Miller was arrested on 27 March 1981 in connection with an armed robbery unrelated to the instant case. On 15 April 1981, he gave police officers a statement concerning the robbery of the Borden Chemical Plant, in which he implicated defendant and Robert Peele. That statement was neither introduced at defendant's trial nor included in the record on appeal.

On 8 October 1981, Detective S. C. Sessoms, Jr., of the Fayetteville Police Department, conducted a hypnotic session with Miller. Sessoms had previously attended a two-week training

---

1. Miller's version of the events at the plant track the testimony of the shift supervisor.

course in hypnosis at the North Carolina Justice Academy. He stated that the course

> consisted of the history and current status of hypnosis, myths and misconceptions of hypnosis, illegal aspects of hypnosis, self-hypnosis training, brain psycho-dynamics, development and training in different techniques of hypnotic induction, deepening techniques, supervising subjects while they were in a hypnotic state, taking statements from subjects in hypnotic conditions, taking composite drawings from people in hypnotic conditions, consisting of written testimony, practical exercises and demonstrations also.

During the course, Sessoms hypnotized between eight and ten people. Prior to hypnotizing Miller, Sessoms read none of Miller's statements concerning the case. The attempted hypnosis was to seek additional recall of the robbery which Miller did not have in a normal state. Sessoms explained the process to Miller and proceeded to induce him into a hypnotic state. In Sessoms' opinion, he successfully hypnotized Miller. The process lasted for about an hour. During the hypnotic session, Miller related facts which corresponded with his subsequent testimony. Miller also testified that he did not believe he had been hypnotized by Sessoms.

Defendant was tried and convicted for the armed robbery and conspiracy to commit armed robbery of the Borden Chemical Plant. Judge Robert L. Farmer consolidated the cases for judgment and sentenced defendant to a minimum term of seven years and a maximum term of ten years. The Court of Appeals affirmed. We allowed defendant's petition for discretionary review on 5 April 1983. N.C. Gen. Stat. § 7A-31.

## II.

The issue before us is whether hypnotically refreshed testimony is admissible. We do not write, however, on a clean slate. Numerous state and federal courts which have considered this issue can be categorized as follows: (1) cases holding that the effect of prior hypnosis goes only to the weight and credibility, not the admissibility of a witness's testimony; (2) cases holding that hypnotically refreshed testimony is admissible only if the hypnosis followed certain guidelines; and (3) cases holding that

State v. Peoples

testimony based on hypnotically refreshed memory is inadmissible.[2]

We have, until today, adhered to the first position. *State v. McQueen*, 295 N.C. 96, 119, 244 S.E. 2d 414, 427 (1978). In *McQueen* we observed that

[t]he circumstance that this witness was hypnotized prior to trial would bear upon the credibility of her testimony concerning the occurrences at the Norris house at the time the two women were killed, but would not render her testimony incompetent. [T]he jury was fully advised that the witness had been so hypnotized. Her credibility, as a result of this circumstance, and of other matters bearing thereon, was for the jury.

*Id.* At the time of our decision in *McQueen*, however, we were not apprised of the problems inherent in hypnosis. Much of the literature and judicial analysis regarding hypnosis has emerged since *McQueen* was decided. Because of recent developments in the understanding of hypnosis as a tool to refresh or restore memory and the judicial trend away from acceptance of hypnotically refreshed testimony, we now reexamine our position in *McQueen* in light of the facts before us.

We are also cognizant of the vast array of scholarly literature on hypnosis contained in both legal and scientific journals. These sources provided great insight into the process of hypnosis, and we defer to them for this purpose. Our goal is to analyze the legal question of evidentiary admissibility so as to secure a just result. Unfortunately, we cannot achieve this without some treatment of the hypnotic process itself. We will, however, follow a simple approach. First, we explain briefly the process of hypnosis, emphasizing its potential relationship to the judicial process. Second, we examine and evaluate the three categories of judicial decisions regarding the admissibility of hypnotically refreshed testimony. Third, we announce the rule to be applied in the courts of this state.

2. Representative cases in each category are cited and discussed in Part IV, infra.

### III.

The basis for the use of hypnotically refreshed testimony hinges on the notion that memory involves the storage of information received by the body's senses in the brain and, therefore, an inability to remember is merely an inability to retrieve previously stored information. Orne, "The Use and Misuse of Hypnosis in Court," 27 Int. J. Clinical and Experimental Hypnosis, 311, 321 (1979). Under this theory, hypnosis operates in a fashion which allows the subject to overcome the difficulties in retrieving this stored information. *United States v. Valdez*, 722 F. 2d 1196, 1200 (5th Cir. 1984) (quoting Putnam, "Hypnosis and Distortions in Eyewitness Memory," 27 Int. J. Clinical and Experimental Hypnosis, 437, 439-40 (1979)). An explanation for this position, simply stated, draws an analogy between the memory process and a multi-channel video tape recorder. All sensory impressions are supposedly recorded and stored in their pristine form inside a person's head to be played back at the time of recall. Theoretically hypnosis activates the video tape recorder. Orne, *supra*, at 321.

Hypnosis, however, involves more than the mere retrieval of stored or suppressed information. What often seems to be recall is in reality a process through which information received after an event is transformed by the subject's mind into a memory of that event. *See id.* Essentially the apparent recollection of a hypnotized subject may actually be a view which he has created subconsciously. This composite may evolve from a number of sources, including information gathered from other events, original recall, suggestions occurring during hypnosis from a variety of sources, and the unconscious adding of missing details. Martin T. Orne, one of the leading recognized experts on hypnosis, flatly rejects the video tape recorder theory of memory and casts serious doubts on the inherent reliability of hypnotically refreshed testimony.

Given this basic description of the theory underlying hypnosis, it is illuminating to examine the specific aspects of hypnotic recall relevant to its use in a judicial proceeding. Such aspects center on the reliability, or potential for accuracy, of recall stimulated by hypnosis.

Scientists generally agree that a number of flaws exist in the hypnotic process which can contribute to inaccurate recollections. These include the subject's eager suggestibility to the hypnotist's

words or actions, his desire to accommodate the hypnotist, and his inability to distinguish between actual memory and pseudo memory arising from the hypnosis. Barnard L. Diamond, another recognized expert in the area, explains that hypnosis is

> a state of increased suggestibility. . . .
>
> [S]uch suggestions cannot be avoided. The suggestive instructions and cues provided to the subject need not be, and often are not, verbal. . . . Especially powerful as an agent of suggestion is the context and purpose of the hypnotic session. Most hypnotic subjects aim to please. . . .
>
> It is very difficult for human beings to recognize that some of their own thoughts might have been implanted and might not be the product of their own volition. . . . Normally, mental processes are rationalized and experienced as the product of free will, even when it should be obvious that they are not.

Diamond, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Cal. L. Rev. 313, 333-34 (1980). These considerations operate in tandem with the accepted notion that hypnotized subjects confabulate, *i.e.* invent details to supply unremembered events in order to make their account complete and logical, as well as acceptable to the hypnotist. *Id.* at 342.

Although scientists do not understand the exact nature of hypnosis, they do recognize that it is a trance-like state induced by the hypnotist. Beyond this superficial explanation, the following characteristics have been observed:

> 1. *Subsidence of the planning function.* The hypnotized subject loses initiative and lacks the desire to make and carry out plans of his own. . . .
>
> 2. *Redistribution of attention.* . . . [U]nder hypnosis selective attention and selective inattention go beyond the usual range. . . .
>
> 3. *Availability of visual memories from the past, and heightened ability for fantasy-production.* . . . The memories are not all veridical, and the hypnotist can in fact suggest the reality of memories for events that did not happen.

4. *Reduction in reality testing and a tolerance for persistent reality distortion.* . . . Reality distortions of all kinds, including acceptance of falsified memories . . . and all manner of other unrealistic distortions can be accepted without criticism within the hypnotic state.

5. *Increased suggestibility.* The suggestibility theory of hypnosis is so widely accepted that hypnosis and suggestibility come to be equated by some writers on hypnosis.

6. *Role behavior.* The suggestions that a subject in hypnosis will accept are not limited to specific acts or perceptions; he will, indeed, adopt a suggested role and carry on complex activities corresponding to that role.

7. *Amnesia for what transpired within the hypnotic state.* . . . [Amnesia] is not an essential aspect of hypnosis. . . . Yet it is a very common phenomenon, and it can be furthered through suggestion.

E. Hilgard, The Experience of Hypnosis 6-10 (1968), *quoted in* Diamond, *supra* at 316. These characteristics demonstrate the need for extreme caution in using hypnotically refreshed testimony in a judicial proceeding.

The possibility that a person's testimony might be the result of suggestion from another person presents a firm indictment of the reliability of such testimony. The potential for suggestion is exacerbated by the fact that the hypnotic process is directed by a particular individual and the attention of the subject is wholly focused upon that person. Furthermore, suggestions can be entirely unintended and even unperceived by the hypnotist as well as the subject. Orne, *supra* at 322-27. Likewise, the subject experiences an overwhelming desire to please the hypnotist and, hence, becomes even more susceptible to suggestion. The subject may unwittingly produce responses which he perceives to be expected. Since a subject under hypnosis undergoes an impaired critical judgment, he may give undue credence to vague and fragmentary memories upon which he would not have relied outside the hypnotic state. *Id.* at 316-20. A combination of a susceptibility to suggestion and a compelling desire to please the hypnotist causes the subject to experience an unwillingness to admit that he cannot recall certain events. Thus he becomes susceptible to creating the event.

If we accept as true the notions of suggestibility and a tendency to confabulate, the dangers surrounding hypnotically refreshed testimony become even more pronounced when we realize that it is virtually impossible for the subject or even the trained, professional hypnotist to distinguish between true memory and pseudo memory. *Id.* at 17; Diamond, *supra* at 333-34. Both the subject and the hypnotist would tend to accept the accuracy of the post-hypnotic recall. Certainly if neither the subject nor the hypnotist can distinguish between true memory and confabulation, a lay observer, be it judge or juror, could hardly make the distinction. Absent objective, independent means to verify this recall, its accuracy must remain both unknown and unknowable.

In addition to resulting in this inability to distinguish between actual and created memory, the process of hypnosis tends to enhance the subject's confidence in his memory, whether genuine or invented. Orne, *supra* at 332. After a subject experiences what he believes to be a recall of events under hypnosis, he may develop an unshakable subjective conviction and confidence in his refreshed recollection. One court noted that this problem

> is enhanced by two techniques commonly used by lay hypnotists: Before being hypnotized the subject is told (or believes) that hypnosis will help him to 'remember very clearly everything that happened' in the prior event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively.

*People v. Shirley*, 31 Cal. 3d 18, 65, 641 P. 2d 775, 803-04, 181 Cal. Rptr. 243, 272, *cert. denied*, 459 U.S. 860 (1982). This difficulty is enhanced after the subject leaves the hypnotic session because he "remembers the content of his new 'memory' but forgets its source, *i.e.*, forgets that he acquired it during the hypnotic session. . . ." *Id.*

In short, hypnosis not only irrevocably masks whether a subject's recall induced by it is true, it also creates a barrier to the ascertainment of its truthfulness through cross-examination—that method normally relied on in the courtroom to test the truthfulness of testimony. With this background regarding the scientific understanding of hypnosis, we turn to an examination and criti-

cism of the various ways in which courts have dealt with the admissibility of hypnotically refreshed testimony.

## IV.

As we have explained, judicial decisions respecting the admissibility of hypnotically refreshed testimony fall into three basic groups: decisions holding that hypnosis affects only the credibility of the witness; decisions holding that hypnotically refreshed testimony is admissible if the hypnotic process followed certain procedural safeguards; and decisions holding that hypnosis renders a witness's subsequent testimony inadmissible. We will discuss each approach *seriatim*, noting the rationale underlying it and evaluating it in light of the nature of hypnosis.

### A. *The Credibility Approach.*

The first major decision to consider the use of hypnosis to enhance a witness's memory was *Harding v. State*, 5 Md. App. 230, 246 A. 2d 302 (1968), *overruled, Collins v. State*, 52 Md. App. 186, 447 A. 2d 1272 (1982), *aff'd*, 296 Md. 670, 464 A. 2d 1028 (1983). In *Harding* the victim of a rape and assault testified after she had been hypnotized in order to recall the event. She explained that she was testifying from her own recollection. That testimony was supported by the hypnotist who testified, as an expert, that hypnosis was generally reliable and not unduly suggestive. He stated that "I seriously doubt suggestibility in the way we think of, in that you have an influence and the person subjects himself to your influence." *Id.* at 240, 246 A. 2d at 308. The Maryland court concluded that the fact of hypnosis went to the witness's credibility and not to the admissibility of the evidence. This approach viewed the challenged testimony as a present recollection of past events merely refreshed by the hypnosis, much as it might have been refreshed by any stimulus. Accordingly, the fact that a witness had been hypnotized went only to his credibility as a witness.

The obvious advantage of this approach hinges on its permitting the jury to hear all testimony which might be important in a given case. Furthermore, it affords the jury an opportunity to hear certain testimony which may prove critical, especially where the witness who has been hypnotized is the bulwark of the prosecution's case. Under this approach, traditional legal devices in-

cluding cross-examination of the witness; disclosure to the jury of the hypnotism; expert testimony on hypnosis, its risks, and limitations; and appropriate instructions from the court, purportedly enable the jury to evaluate properly the credibility of a witness who has been hypnotized. *See* Ruffa, *Hypnotically Induced Testimony: Should it be Admitted?* 19 Crim. L. Bull. 293, 298 (1983). Since the *Harding* decision in 1968, a number of jurisdictions, including our own, have followed its lead in holding that a witness's testimony having been refreshed by hypnosis goes only to credibility and not admissibility. *Creamer v. State*, 232 Ga. 136, 205 S.E. 2d 240 (1974); *People v. Smrekar*, 68 Ill. App. 3rd 379, 24 Ill. Decisions 707, 385 N.E. 2d 848 (1979); *Pearson v. State*, 441 N.E. 2d 468 (Ind. 1982); *State v. Wren*, 425 So. 2d 756 (La. 1983); *State v. Greer*, 609 S.W. 2d 423 (Mo. Ct. App. 1980), *vacated on other grounds*, 450 U.S. 1027 (1981); *State v. McQueen*, 295 N.C. 96, 244 S.E. 2d 414 (1978); *State v. Brown*, 337 N.W. 2d 138 (N.Dak. 1983); *State v. Brom*, 8 Or. App. 598, 494 P. 2d 434 (1972); *State v. Glebock*, 616 S.W. 2d 897 (Tenn. Cr. App. 1981); *Chapman v. State*, 638 P. 2d 1280 (Wyo. 1982).

Despite the claim that this approach allows the jury to consider all relevant evidence, it is not without its limitations. As we have noted, scientific research indicates the unreliability of hypnotically refreshed testimony.[3] We were not aware of the significant pitfalls in this process when we decided *McQueen* and apparently the *Harding* Court was similarly unapprised. As one expert on hypnosis explained,

> Perhaps if the *Harding* trial and appellate courts had been presented a more accurate description of the nature of hypnosis and the extreme vulnerability of the subject to suggestion, they might have been less disposed to admit the evidence, and the subsequent trend of the law might have been different.

Diamond, *supra*, at 323. The overwhelming scientific evidence is that a subject under hypnosis is extremely susceptible to suggestion, has an often overwhelming desire to please the hypnotist, and is left, after hypnosis, with an inability to distinguish be-

---

3. For an excellent summary of the different types of scientific research and their findings, see Orne, *supra* at 315-25.

tween pre-hypnotic memory and post-hypnotic recall, which may be the product of either suggestion, confabulation or both. Thus, the very foundation of the *Harding* approach is questionable, since hypnotically refreshed testimony may well be completely unreliable. More important, this unreliability may be impossible for even an expert to ascertain since neither the hypnotist nor the subject can accurately determine whether a hypnotized person's recall under or after hypnosis is actual memory or confabulation.

Perhaps the most serious flaw in the credibility approach is the misconception that cross-examination of the previously hypnotized witness will allow the opponent not only to illustrate the risk of the procedure, but also to contest the witness's testimony. Scientific research indicates that once a subject experiences hypnotic recall, his confidence in the accuracy of his recall is greatly strengthened. This enhanced confidence may give the witness an unshakable conviction that his testimony is accurate. Diamond, *supra*, at 339 (noting that one "remarkable feature of hypnosis is its apparent ability to resolve doubts and uncertainties . . ."). This false confidence may actually nullify the safeguard of cross-examination.

In a criminal proceeding a defendant has a constitutional right to confront the witnesses against him. U.S. Const. amend. VI. Since a previously hypnotized witness has no recollection of the procedure itself, the defendant is unable to question him about the hypnotic process and his right of confrontation on this point is completely frustrated. Effective cross-examination is, furthermore, nearly impossible when a witness's confidence in his recall has been artificially enhanced by hypnosis.

In the final analysis, overwhelming scientific evidence suggests that hypnotically refreshed testimony is not inherently reliable and that cross-examination is not an adequate safeguard against the dangers inherent in hypnosis. Yet there is a "scientific" aura which is associated with hypnosis that may be so well-entrenched in the minds of potential jurors that they assign undue credibility to hypnotically refreshed testimony. Jurors may "accord uncritical and absolute reliability to a scientific device without consideration of its flaws in ascertaining veracity." *Commonwealth v. Nazarovitch*, 496 Pa. 97, 102, 436 A. 2d 170, 173

(1981) (quoting Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?* 38 Ohio L. J. 567, 583 (1977)). Jurors are, quite simply, not able to be arbiters of the credibility of hypnotized witnesses. Ruffa, *supra*, at 314.

We conclude, therefore, that the credibility approach to hypnotically refreshed testimony is unsound and should be rejected. In overruling *Harding*, the Maryland court reached the same conclusion. *Collins*, 52 Md. App. 186, 447 A. 2d 1272 (1982), *aff'd*, 296 Md. 670, 464 A. 2d 1028 (1983).

B. *The Safeguards Approach.*

The second group of cases which adopt a middle ground is exemplified by *State v. Hurd*, 86 N.J. 525, 432 A. 2d 86 (1981). As the New Jersey Court explained, "Hypnotically-induced testimony may be admissible if the proponent can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy." *Id.* at 538, 432 A. 2d at 92. These decisions recognize the general problems associated with hypnosis, including extreme suggestibility, loss of critical judgment, tendency to confabulate, and increased confidence in one's recall. In an effort to reconcile these scientifically established problems associated with hypnosis with the recognition that rendering hypnotically refreshed testimony inadmissible may result in the potential loss of important evidence, these cases carve out a middle ground between admissibility and inadmissibility. To facilitate this approach, the *Hurd* Court adopted the following set of guidelines:

> First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. . . .

> Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

> Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or in other suitable form. . . .

> Fourth, *before* inducting hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. . . .

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received. . . .

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. . . .

*Id.* at 544-46, 432 A. 2d at 96-97. These procedural safeguards were first suggested by Orne. *See* Orne, *supra*, at 335-36. A number of courts have followed New Jersey's lead in taking this middle ground, adopting guidelines similar to those above. *See Brown v. State*, 426 So. 2d 76 (Fla. Dist. Ct. App. 1983); *State v. Beachum*, 97 N.Mex. 682, 643 P. 2d 246 (Ct. App. 1981); *State v. Martin*, 33 Wash. App. 486, 656 P. 2d 526 (1982). Oregon has codified this approach in its statutes. Or. Rev. Stat. § 136.675 (1981).

Theoretically, adherence to these procedural requirements is supposed to increase the reliability of hypnotically refreshed testimony and decrease the dangers inherent in the hypnotic process, especially that of suggestion. Armed with a proper and complete record of the entire hypnotic process, a court may exclude hypnotically refreshed testimony if it deems it too unreliable after considering the procedures employed in performing the hypnosis. Since the jury hears this evidence only after the court makes an initial judgment of reliability, this approach at least eliminates the problems associated with the jury's having to make its own determination of reliability.

A number of problems still remain. The most important is that ascertaining the reliability of hynotically refreshed testimony may yet remain practically impossible even for well trained observers including the trial judge. If, as many experts on hypnosis believe, the hypnotized subject tends to confabulate or fill in gaps in his memory so that neither he nor the trained hypnotist can distinguish between what the subject truly recollects and what he has confabulated, then ascertaining the reliability of his hypnotically refreshed testimony becomes practically impossible. Only if this testimony is independently corroborated would its accuracy be reasonably ascertainable. In that case, however, the

need for the hypnotically refreshed testimony is diminished since the corroborating evidence could often be used in its place.

This approach also contemplates a case-by-case analysis of admissibility of specific hypnotically refreshed testimony. It consumes judicial time and leads to conflicting results in the trial courts. Further, it could have the adverse effect of giving hypnotically refreshed testimony, in the eyes of the jury, "an aura of reliability which, in actuality, it does not possess. . . ." *People v. Gonzalez*, 108 Mich. App. 145, 160, 310 N.W. 2d 306, 313 (1981), *aff'd*, 415 Mich. 615, 329 N.W. 2d 743 (1982), *modified on other grounds*, 417 Mich. 968, 336 N.W. 2d 751 (1983).

The courts which admit hypnotically refreshed testimony if it follows certain safeguards equate the potential inaccuracies of hypnotically refreshed testimony with "often historically inaccurate" ordinary eyewitness testimony. *Hurd*, 86 N.J. at 542-43, 432 A. 2d at 92. Certainly all eyewitness testimony is subject to inaccuracies because human beings are fallible. The problem with hypnotically refreshed testimony lies not so much with the fallibility of the human witness but with the defects in the hypnotic process itself which cannot be compensated for by the ordinary trial process. Hypnotically refreshed testimony is, quite simply, *not* like normal eyewitness testimony. The fatal flaw with the safeguards approach, as acknowledged by Orne who originally proposed it, is that the safeguards cannot prevent the subject from confusing that which he has confabulated under hypnosis with actual memory. Orne, Affidavit for Amicus Curiae Brief in Opposition to Petition for Rehearing before California Supreme Court at 6-7, *People v. Shirley*, 31 Cal. 3rd 18, 641 P. 2d 775, 181 Cal. Rptr. 243 (1982), *quoted in* Ruffa, *supra* at 294 n. 8. Thus, this approach affords no acceptable way to test the reliability of hypnotically refreshed testimony.

C. *The Inadmissibility Approach.*

A growing number of state courts have adopted a general rule that hypnotically refreshed testimony is inadmissible, a position first taken in *State v. Mack*, 292 N.W. 2d 764 (Minn. 1980). *See State v. Mena*, 128 Ariz. 226, 624 P. 2d 1274 (1981); *People v. Shirley*, 31 Cal. 3rd 18, 641 P. 2d 775, 181 Cal. Rptr. 243, *cert. denied*, 459 U.S. 860 (1982); *Strong v. State*, --- Ind. ---, 435 N.E. 2d 969 (1982); *Collins v. State*, 52 Md. App. 186, 447 A. 2d 1272

(1982); *People v. Gonzalez*, 415 Mich. 615, 329 N.W. 2d 743 (1982), *modified on other grounds*, 417 Mich. 968, 336 N.W. 2d 751 (1983); *State v. Palmer*, 210 Neb. 206, 313 N.W. 2d 648 (1981); *People v. Hughes*, 88 A.D. 2d 17, 452 N.Y. Supp. 2d 929 (1982); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A. 2d 170 (1981). At least one federal court also follows this rule. *See United States v. Valdez*, 722 F. 2d 1196 (5th Cir. 1984). This approach appears to be gaining in judicial favor. *See* Note, *Pretrial Hypnosis and its Effect on Witness Competency in Criminal Trials*, 62 Neb. L. Rev. 336, 346 (1983).

These decisions reflect a common concern with the present state of the art of hypnosis. They elect to preclude the admission of hypnotically refreshed testimony because the indices of unreliability inherent in normal memory reappear in more extreme forms when the witness is hypnotized. The "safeguards" theory, first enunciated by *Hurd*, is deemed inadequate and impractical in alleviating this unreliability. *Shirley*, 31 Cal. 3rd at 63 n. 44, 641 P. 2d at 802 n. 44, 181 Cal. Rptr. at 270 n. 44. In reaching the judgment that hypnosis, as a scientific method for improving a witness's recollection, is unreliable, many courts have determined that the scientific community has not recognized hypnosis as a generally reliable method of enhancing a witness's recollection to the extent that it should be used in judicial proceedings. *See Mena*, 128 Ariz. at 231, 624 P. 2d at 1279; *Nazarovitch*, 496 Pa. at 110, 436 A. 2d at 177. These cases rely upon the standard established in *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923). This widely recognized and cited case formulated the general rule that expert testimony on a new scientific technique can only be admitted when that technique has "gained general acceptance in the particular field in which it belongs." *Id.* at 1014. Courts relying upon *Frye* scrutinize the scientific testimony and literature to determine whether hypnosis has "gained such standing and scientific recognition among [the] authorities as would justify the courts in admitting" hypnotically refreshed testimony. *Id.* As the *Mack* court stated, "Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate." 292 N.W. 2d at 768 (Minn. 1980).

Courts which adopt the view that hypnotically refreshed testimony is inadmissible reject both the notion that a witness's having been hypnotized goes only to his credibility and the belief that the unreliability inherent in hypnosis can be eliminated or sufficiently curbed by following certain procedural safeguards. *Valdez*, 722 F. 2d at 1202. By holding hypnotically refreshed testimony inadmissible, these courts risk excluding evidence which may be both relevant and probative on certain issues. *Id.* at 1201. Despite this potential loss of evidence, the unreliability of the hypnotic process and its unacceptability within the scientific community have led these courts to conclude that the fairest practice is to keep hypnotically refreshed testimony out of judicial proceedings.

Several courts, while adopting a general rule of inadmissibility, have refrained from making the rule absolute. The Fifth Circuit noted that in a given case, "the evidence favoring admissibility might make the probative value of the testimony outweigh its prejudicial effect. If adequate procedural safeguards have been followed, corroborative post-hypnotic testimony might be admissible." *Valdez*, 722 F. 2d at 1203. The California Supreme Court exempted testimony of a criminal defendant himself from its rule of inadmissibility. The Court created this "necessary exception to avoid impairing the fundamental right of an accused to testify in his own behalf." *Shirley*, 31 Cal. 3d at 67, 641 P. 2d at 805, 181 Cal. Rptr. at 273. Furthermore, courts which have ruled hypnotically refreshed testimony inadmissible have not precluded the testimony of a previously hypnotized witness concerning matters related prior to the hypnotic session, so long as the testimony does not relate the fact that the witness has been hypnotized. *State ex rel. Collins v. Superior Court of Arizona*, 132 Ariz. 180, 209-10, 644 P. 2d 1266, 1295 (1982); *Shirley*, 31 Cal. 3d at 67, 641 P. 2d at 805, 181 Cal. Rptr. at 273; *Mack*, 292 N.W. 2d at 771; *Commonwealth v. Taylor*, 294 Pa. Super. 171, 439 A. 2d 805 (1982). The general approach is to find hypnotically refreshed testimony inadmissible subject to these limited exceptions.

V.

[1] Our review of the state of the art of hypnosis and the judicial decisions which have considered the admissibility of hypnotically refreshed testimony lead us to conclude that our deci-

sion in *McQueen* should be overruled insofar as it permits the admission of hypnotically refreshed testimony. Given the problems inherent in the hypnotic process, such as the enhanced suggestibility of the subject, his tendency to confabulate when there are gaps in his recollection, his increased confidence in the truthfulness and accuracy of his post-hypnotic recall which may preclude effective cross-examination, and the inability of either experts or the subject to distinguish between memory and confabulation, hypnotically refreshed testimony is simply too unreliable to be used as evidence in a judicial setting.

A salient factor influencing our decision to review and overrule *McQueen* is Maryland's decision to overrule *Harding. Collins,* 52 Md. App. 186, 447 A. 2d 1272 (overruling *Harding v. State,* 5 Md. App. 230, 246 A. 2d 302 (1978) ), *aff'd,* 296 Md. 670, 464 A. 2d 1028. We followed *Harding* in *McQueen* and the recent overruling of *Harding* by the Maryland Court of Appeals erases the cornerstone of the credibility approach to hypnotically refreshed testimony and, hence, the basic premise of *McQueen.* As one commentator noted, "*Collins* destroys the very foundation of those cases that have viewed hypnosis as only affecting the credibility of witnesses." Note, "Pretrial Hypnosis," *supra* at 344. We find the change adopted by the Maryland courts extremely persuasive in our analysis of the admissibility of hypnotically refreshed testimony.

A number of the courts which have applied the *Frye* test and concluded that hypnotically refreshed testimony is inadmissible have used that test in other contexts. *See State v. Wakefield,* 263 N.W. 2d 76 (Minn. 1978) (considering the admissibility of polygraph results); *State ex rel. Trimble v. Hedman,* 291 Minn. 442, 192 N.W. 2d 432 (1971) (considering the admissibility of voice prints). Although we have not specifically adopted the *Frye* test in this jurisdiction, we have used the theory underlying that decision. In holding that the results of polygraph examinations should not be admitted, we stressed that the polygraph had "not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception." *State v. Foye,* 254 N.C. 704, 708, 120 S.E. 2d 169, 172 (1961). *Accord, State v. Brunson,* 287 N.C. 436, 445, 215 S.E. 2d 94, 100 (1975). Furthermore, in our recent decision which changed our exception to this rule and held that the results of polygraph examinations could not be admitted even

by stipulation, we stressed the "lack of general scientific recognition" as a major factor in our decision. *State v. Grier*, 307 N.C. 628, 638, 300 S.E. 2d 351, 356 (1983).

In addition to holding that hypnosis has not reached a level of scientific acceptance which justifies its use for courtroom purposes, we further conclude that no set of procedural safeguards can adequately remedy this unreliability. Dr. Orne, who designed the safeguards generally followed by courts which have adopted them, has admitted that they are ineffective in eliminating the dangers associated with hypnosis. We are persuaded that the inability of either an expert or the hypnotized witness to distinguish between the witness's confabulation and true memory is sufficient for us to conclude that adopting a series of procedural safeguards would not be effective in combating the dangers we see in hypnotically refreshed testimony. We hold, therefore, that hypnotically refreshed testimony is inadmissible in judicial proceedings. Our cases to the contrary are overruled.

This holding is consistent with our recent determination that the results of polygraph tests are inadmissible even upon the stipulation of the parties. *Id.* In making that determination, we noted the futility of giving the trial judge discretion to determine case-by-case whether particular polygraph testing was reliable, the consumption of judicial time and resources in making such determinations, and the undue influence which such results might have upon the jury. *Id.* at 642-43, 300 S.E. 2d at 359-60. These same considerations militate against adopting procedural safeguards like those articulated in *Hurd*.

[2] Our rule of inadmissibility does not, however, render all testimony of a previously hypnotized witness inadmissible. A person who has been hypnotized may testify as to facts which he related before the hypnotic session. The hypnotized witness may not testify to any fact not related by the witness before the hypnotic session. Investigators, attorneys, and other parties who might have occasion to induce potential witnesses to be hypnotized are cautioned to make every effort to preserve, in writing or otherwise, this pre-hypnotic information. When a party attempts to offer testimony by a person who has been hypnotized, that party will bear the burden of proving that the proffered testimony was related prior to hypnosis. A party proffering the

testimony of a previously hypnotized subject is under a duty to disclose the fact of this hypnosis to the court and counsel, outside the presence of the jury and before the testimony of the witness.

We wish to make clear that this rule does not affect the use of hypnosis in criminal investigations. We caution, however, those who use hypnosis; it is a procedure to be executed with care. We suggest that the procedural safeguards formulated by Dr. Orne and adopted by *Hurd*, which have been quoted earlier in this opinion, be followed in the use of hypnosis for criminal investigative purposes. *See Valdez*, 722 F. 2d at 1204; *Collins*, 132 Ariz. at 187, 644 P. 2d at 1273.

## VI.

[3] We must also consider the application of the rule announced herein to other cases involving hypnotically refreshed testimony. In assessing the potential retroactive application of this rule, both the purpose which it seeks to achieve and the effect of retroactive application on the administration of justice are important. *See Brown v. Louisiana*, 447 U.S. 323, 328 (1980); *Hankerson v. North Carolina*, 432 U.S. 233, 248 (1977); *Stovall v. Denno*, 388 U.S. 293, 297 (1967). The purpose of the rule making hypnotically refreshed testimony inadmissible is to prevent the admission of inherently unreliable evidence. As we have explained, the dangers associated with this type of testimony are too great to allow it to infect the fact-finding process. The admission of hypnotically refreshed testimony directly affects the truth-seeking function of the courts. Our new rule should be given broadest application consistent with the due administration of justice. Therefore, our holding in this case will apply only to cases which have not been finally determined on direct appeal as of the certification date of this decision. It may not be used as the basis for collaterally attacking any case which has been finally determined on direct appeal or in which no appeal was taken from the trial judgment. We think this fairly balances those considerations calling for the adoption of the new rule against any adverse impact upon the administration of justice caused by its adoption.

[4] In applying our new rule retroactively to all cases which have not been finally determined on direct appeal as of the date on which this opinion is certified, we will examine each appeal on a case-by-case basis to determine if the error was reversible, *i.e.*,

whether a reasonable possibility exists that a different result would have been reached at the trial had the evidence not been erroneously admitted. The use of this harmless-error analysis will allow us to correct errors in which the truth-seeking process was tainted by the hypnotically refreshed testimony while imposing minimal adverse impact on the administration of justice.

## VII.

[5] In this case, the testimony by Detective Sessoms regarding the hypnotic session and the admission and playing before the jury of the video tape of the witness Miller during the hypnotic session were inadmissible under the rules we today announce. Yet they constituted a major portion of the state's case. Miller was, by his own admission, an accomplice of defendant. His testimony, after undergoing hypnosis for the purpose of refreshing his recollection, was in large part responsible for defendant's conviction. Since Miller's statement made before the hypnotic session was not proffered at trial nor is it contained in the record on appeal, none of his testimony was admissible under the rules we today announce. The video tape of the hypnotic session strengthened the credibility of his testimony in the eyes of the jury. It gave an unwarranted aura of reliability to his testimony. These erroneous admissions taken together constitute reversible error because a reasonable possibility exists that a different result would have been reached had this evidence not been admitted at defendant's trial. N.C. Gen. Stat. § 15A-1443(a). We therefore reverse the decision of the Court of Appeals and remand the case to that court for further remand to the superior court where defendant will be given a new trial to be conducted under the rules we today announce.

Reversed and remanded.