# Richmond

ODELL WALLER v. COMMONWEALTH OF VIRGINIA.

October 13, 1941.

Record No. 2442.

Present, All the Justices.

The opinion states the case.

*Thomas H. Stone, Howard H. Davis, John F. Finerty* and *Morris Shapiro,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

The accused, Odell Waller, was indicted for the murder of Oscar Davis. He was found, by a jury, guilty of murder in the first degree and sentence of death was pronounced by the trial court.

Upon the calling of the case for trial, counsel for the accused filed a motion to quash the indictment, on the ground that the indictment was returned by a grand jury from which non-poll tax payers had been excluded. This motion the court overruled.

After a plea of not guilty was interposed by the accused, counsel for the accused moved the court to quash the *venire facias,* on the ground that "said *venire facias* had been selected from a list of poll tax payers of the county of Pittsylvania, and that such manner of selection denied him his right to a trial by a jury of his peers, and deprived him of due process of law and equal pro-

tection of the laws in contravention of the eighth section of the Virginia Bill of Rights and the Fourteenth Amendment of the Constitution of the United States.'' This motion the court denied.

The action of the court in overruling these two motions is assigned as error.

It conclusively appears from the record, as shown by Bill of Exceptions number one and Bill of Exceptions number two, that accused did not offer any proof whatsoever to sustain the two motions.

The sole reliance of the accused to sustain the motions is based upon a presumption, and not upon evidence. This is shown by the petition for a writ of error, which contains this statement: ''It must be presumed then, that both the grand jury in the instant case and the petit jury panel were selected solely from those possessing the constitutional qualifications of voting, which means solely from poll tax payers. Therefore there was no necessity to offer proof that either the grand or petit juries were so constituted.''

The crux of the contention is that the grand jury which indicted the accused, and the petit jury which tried him, were selected by a method which discriminated against a particular social or economic group, viz: non-poll tax payers, and thereby, the accused was denied equal protection of the laws.

The solution of this contention must be based upon a fact and not upon a presumption.

There is not a scintilla of evidence in the record to show that accused had, or had not paid a poll tax; hence, he is in no position to complain of such discrimination, had it existed.

In *Grosso* v. *Commonwealth,* 177 Va. 830, 13 S. E. (2d), 285, Mr. Justice Eggleston said:

''It is well settled that one challenging the constitutionality of a provision in a statute has the burden of showing that he himself has been injured thereby. It avails him nothing to point out that some other person might conceivably be discriminated against.

██ "As this court said in *Carpel of Richmond, Inc.* v. *City of Richmond,* 162 Va. 833, 842, 175 S. E. 316, 319: 'Before one can ask that a statute be declared unconstitutional, he must show that he has been injured. Until that has been done, it is, so far as he is concerned, but a moot question.' "

That such a discrimination does not exist is manifest from an examination of the organic and statutory law applicable.

There is no provision in the Constitution of the Commonwealth of Virginia prescribing the qualifications of a grand juror or a petit juror. The only qualifications for a grand juror or a petit juror are those found in the statutory enactments of the legislature.

Section 4852 of the Code provides that the judge of the circuit court shall annually "select from the male citizens of each county * * * forty-eight persons twenty-one years of age and upwards, of honesty, intelligence, and good demeanor, and suitable in other respects to serve as grand jurors who shall be the grand jurors for the county * * * for twelve months next thereafter. Such jurors shall be selected in each county from the several magisterial districts of the county * * * ."

Section 4853 of the Code provides: " * * * Each grand juror shall be a citizen of this State, twenty-one years of age, and shall have been a resident of this State two years, and of the county or corporation in which the court is to be held one year, and in other respects a qualified juror, * * * ."

Section 5984 of the Code provides: "All male citizens over twenty-one years of age who shall have been residents of this State one year, and of the county, city or town in which they reside six months next preceding their being summoned to serve as such, and competent in other respects, except as hereinafter provided, shall remain and be liable to serve as jurors; * * * ."

██ Notwithstanding the plain language of the statutes, it is earnestly contended that the language in sec-

tion 4853, ''and in other respects a qualified juror,'' and the language in section 5984, ''and competent in other respects,'' should be construed as referring to the constitutional provision dealing with the qualification of a voter, to-wit, the payment of a poll tax; and that grand jurors and petit jurors ''must possess constitutional qualifications of voting.'' This contention is untenable.

The identical point was raised in *Booth's Case*, 16 Gratt. (57 Va.) 519. In construing the pertinent language, Judge Moncure said:

''Again it may be said, that the 4th sec. of ch. 206 of the Code, p. 767, which still remains in force, requires that 'for every grand jury there shall be summoned twenty-four citizens of this state, who are freeholders of the county or corporation in which the court is to be held, and in other respects qualified jurors, and not constables,' &c., and that the words 'in other respects qualified jurors,' must refer to the first section of the act of 1853, as there is no other act now in force which creates any other qualification than those contained in the 4th section itself of ch. 206 of the Code. I have already had occasion to notice why these words were inserted in the Code, and they lost much if not most of their meaning by the amendment in the legislature of chapter 162, sec. 1 of the Code, as reported by the revisors, while no corresponding change was made in chapter 206, sec. 4. Still the words are not without meaning as the law now stands. There are common law qualifications of grand jurors to which the words may refer. They were required to be *probi, aut liberi, et legales homines*. 5 Bac. Ab. Juries A, p. 311, E 347. And therefore, we are told, it is a good exception at common law to one returned on a grand jury, that he is an alien, or villein, or that he is outlawed for a crime, or that he was not returned by the proper officer, or that he was returned at the instance of the prosecutor. *Id.* 311. Again, in reference to the qualification of jurors, that they should be *liberi et legales homines,* the same author says: 'Hence it has

been always clearly holden that aliens, minors or villeins cannot be jurors.' Also infamy is a good cause of challenge to a juror; as that he is outlawed, or that he hath been adjudged to any corporal punishment whereby he becomes infamous, or that he hath been convicted of treason, or felony, or perjury, &c. *Id.* 347. Indeed, the Code, p. 734, sec. 3, expressly makes conviction of perjury a disqualification; and this is one case at least to which the words in question may refer. That some of these common law disqualifications may be merged in statutory provisions in regard to them, cannot affect others not so merged.''

It is argued by counsel that the *Booth Case* is not in point, as it was dealing with a provision of the Code of 1849 and is not applicable to either of the provisions of the present Constitution or Code section 4853.

The answer to this contention is found in the Revisors' notes to section 4853. There we read:

■ ''This phrase, 'in other respects a qualified juror,' must be interpreted according to the common-law and the statutory requirements for jurors. The common-law requirement is that they should be *probi aut liberi et legales homines*. Therefore it is a good exception at common law to one returned on a grand jury that he is an alien or a minor, or was not returned by proper officer, or that he was returned at the instance of the prosecutor. Also infamy is a good cause for challenge to a juror, or that he hath been convicted of treason, felony, perjury, etc. *Booth's Case*, 16 Gratt. 519, 527.

''For present statutory requirements, see sections 5984 *et seq.*''

The next assignment of error challenges the action of the trial judge in refusing to disqualify himself from presiding at the trial of the accused.

The incident complained of arose in the course of argument on motion for a continuance of the case. When the case was called for trial on September 19, 1940, counsel moved for a continuance, on the ground that only

three days had elapsed since the accused had been indicted and that this was not sufficient time in which to prepare for a trial of the case.

In passing upon the motion for a continuance, the trial judge indulged in the following comments:

"The Court: ...............................

"Stenographer: Would you mind speaking a little louder, please: I can't quite hear what you say.

"The Court: Speaking to the Stenographer: I don't care whether you get it or not. A Trial Court does not have to give any reasons for its rulings. It is no part of the record.

"The Court, to the Attorneys: I am telling you this: A man charged with a criminal offense has no right to await the action of the Grand Jury. He should anticipate that he may be indicted. I must state that since I have been on the bench, this is the first case in which there has been any question on this point. Judge Saunders, one of the ablest Judges who ever presided over this court, laid down this rule, following Sec. 4893 of the Code of Virginia, and this Court has always followed it."

It is argued in the petition for a writ of error that this action of the trial judge indicated "not only a spirit of irritation but also an absolutist spirit not compatible with judicial temperament," and likewise, "negated the presumption of innocence."

Trial judges are but mere mortals and the fact, if such be the case, that they become irritated at the prospect of the law's delay, is not sufficient to cause a reversal of a case, unless it palpably appears that such conduct could have militated against the accused to the extent that he was denied a fair trial according to law. No such conclusion can be properly drawn in the consideration of this assignment of error, or in the refusal of the court to dismiss the *venire* called for the trial of the case.

It is assigned as error that the trial court erred in refusing to grant a change of venue, upon motion of the accused.

In support of this motion, a witness was introduced who testified that he was a paid employee of the ''Waller Defense Committee,'' whose duty it was to assist in the defense of the accused, and that he had heard three different persons in the county indulge in expressions of animus against the accused. Reliance was placed also upon the evidence of the sheriff, that sometime prior to the trial he had heard a rumor of an attempt to lynch the accused. However, the sheriff further stated that very little interest was being shown in the trial, and, in in his opinion, the accused would ''get a fair and impartial trial.''

The evidence introduced by the Commonwealth refutes any suggestion of violence and the record utterly fails to even indicate that the accused was tried in a hostile atmosphere.

This assignment of error is without merit.

The next assignment of error relates to the refusal of the court to sustain the challenge of the accused to eight of the veniremen called as jurors to try the case.

These jurors were challenged solely on the ground that, as shown by the examination on their *voir dire*, they were farmers and employed as tenants persons who, like the accused, received a share of the crop in return for the labor performd.

Concretely stated, it is the contention of counsel for the accused that, due to the fact that accused was what is known as a ''share cropper'' upon the land of Oscar Davis, a tenant farmer, the shooting of Davis by the accused ''arose entirely out of economic circumstances,'' and therefore, ''it is impossible as a matter of law for an employer of a share cropper to act as an impartial juror.''

It is a matter of common knowledge that in the various counties of the Commonwealth the vast majority

of those who are called to serve as jurors are farmers, who by reason of their high standing as citizens, have been selected to perform this most important service.

Counsel do not even remotely suggest that the challenged jurors were not men of worth and fully competent to try the issue between the Commonwealth and the accused. Their sole basis for the challenge was that they were prejudiced jurors because they were landowners who employed tenants to till the land for a share of the crop produced.

In our opinion, no discrimination has been made against the accused and the assignment is without merit.

The next assignment of error challenges the action of the court in accepting G. W. Farson as a juror. When sworn upon his *voir dire,* Farson was asked by counsel for the accused the following questions:

Q. "If it develops in the course of the testimony that a conflict arose between a share cropper and landlord would it or would it not have any effect in prejudicing you one way or the other?"

A. "I don't think I would have any trouble."

Q. "Could you positively state whether it would or not?"

A. "I don't think it would."

Thereupon, counsel said: "For the reason stated, 'he does not think,' we challenge."

Before ruling upon the motion, the court propounded this question:

"Mr. Farson, I don't know whether you understood the question or not, but could you go in the jury box and give a fair and impartial trial regardless of how the case develops?" Mr. Farson answered, "Yes, sir, I can."

Thereupon, the court very properly accepted Farson as a juror.

Error is also assigned to the admission in evidence of alleged dying declarations of Oscar Davis.

The record discloses that early in the morning of July 15, 1940, Mr. Davis was brought to the Memorial Hospital in Lynchburg, Virginia, for treatment for bullet wounds. An examination by Dr. John C. Risher disclosed four bullet wounds, one on the right side of the head, one in the arm and two in the lower part of the back. An X-ray examination showed a bullet had penetrated the abdomen. In the opinion of the attending physicians, an operation was imperative. Following the incision, it was observed that several of the blood vessels had been cut and several feet of intestines had been damaged by the passage of the bullet. Two days after the operation the left lung collapsed and death ensued.

Dr. Risher testified positively that Davis would not have lived had he not been operated upon and that a pulmonary collapse follows a certain percentage of operations.

On July 16, 1940, Frank Davis, a son of the deceased, went to the hospital to visit his father. As he entered the room, Mr. Davis greeted him and then said, ''Frank, I am going to die. Odell shot me without any cause. He shot me four times, twice after I fell.''

Edgar Davis, another son, testified that he came from New Jersey to visit his father and also had a conversation with Mr. Davis in his room at the hospital. This statement is as follows:

''It might have been a second or two ahead of Frank. When I walked (in) I asked him how he was feeling and he said he was feeling mighty bad; said he *won't* going to live, said Odell shot him without any cause at all. * * * Said Odell shot him four times.''

This court has, in numerous cases, dealt with the question of the admissibility in evidence of dying declarations. In the recent case of *Compton* v. *Commonwealth*, 161 Va. 980, 170 S. E. 613, the rule governing the admissibility of dying declarations is stated thus:

''In his Exposition of the Law of Crime and Punishment, at page 288, Professor John B. Minor thus

clearly and concisely states the Virginia rule: 'Dying declarations are admissible only in case of homicide, when made by the person injured touching the cause of his death, while actually in *extremis,* and *conscious* that *he is so,* under a sense of *impending death,* and without any expectation or hope of recovery.' ''

The principal case on the subject and one which has been referred to in practically all the cases subsequent thereto, is *Hill's Case,* 2 Gratt. (43 Va.) 594.

It is unnecessary to reiterate what has been so aptly stated in the court's opinion in that case.

It is, in our opinion, beyond dispute that Oscar Davis was fully conscious of his impending death. Not once did he express the belief that he would survive, but, on the contrary, as shown by the record, his last two declarations before death were that he was going to die.

There is no merit in this assignment of error.

The next assignment of error relates to the action of the court in overruling the motion of counsel for the accused to strike out all instructions dealing with the question of homicide.

The motion was based on the ground that the Commonwealth had not proved beyond a reasonable doubt that the deceased suffered death as a result of the wounds inflicted by the accused. Stated concretely, the contention is that death was due to collapse of the lung and not to bullet wounds.

The evidence of Dr. Risher conclusively shows that without an operation death would have been inevitable, and that the ultimate cause of death was the result of the wounds inflicted by the accused.

See case of *Livingston* v. *Commonwealth,* 14 Gratt. (55 Va.) 592, for a discussion of the question involved.

The last assignment of error challenges the action of the court in overruling the motion of the accused to set aside the verdict of the jury, on the ground that the verdict was contrary to the law and the evidence.

The evidence introduced by the Commonwealth, was credited by the jury and showed, or tended to show, the following facts:

The accused, who is of the Negro race, was a tenant of Oscar Davis, who, in turn, was a renter of one Shields, a white farmer who resided in Pittsylvania county. In the fall of 1939, the accused prepared a certain wheat land, sowed the seed and was to receive for his labor a specified share of the crops. In the spring of 1940, he left the farm and went to the State of Maryland to engage in public work. Upon his return to Virginia on July 13th or 14th, he ascertained that his mother and wife had been evicted by Davis and that his share of the wheat crop had not been delivered to them, as requested. On July 14, 1940, accused and one John Curtis Williams engaged in a conversation in regard to the failure of the accused to get his share of the wheat. Williams' account of the conversation is as follows:

Q. "Your nuame is John Curtis Williams?
A. Yes.
Q. Where do you live?
A. Below Gretna, a little below Mr. Davis.
Q. East of Gretna?
A. Yes.
Q. Where did you see Odell Waller on Sunday?
A. At home.
Q. Did you have any conversation with Odell Waller?
A. No, sir.
Q. Did you ever hear any statements on that day?
A. Yes. His mother was telling about his wheat.
Q. And what was said?
A. Odell said, 'Mr. Davis hasn't give me my wheat.' Mr. Davis said as soon as they finished threshing he will bring it down himself if he can't get nobody else and Odell say, 'I am going to get my wheat or Oscar Davis one.'
Q. What time was that?
A. About four o'clock Sunday evening."

Thomas Younger, a witness for the Commonwealth, testified as follows:

Q. "Did you see Odell Waller at church on July 14, the day before Mr. Davis was shot?

A. Yes, sir.

Q. What time?

A. In the morning about eleven o'clock.

Q. Did you have any conversation with Odell there?

A. Yes.

Q. Just tell the Court and jury what was said there.

A. I saw him at the church about eleven o'clock and he asked me would I take him away. He didn't tell where he wanted me to take him. Said he was going to Mr. Davis' and get his wheat or kill Mr. Davis.

Q. Did you see him any more?

A. Yes.

Q. Where?

A. At church.

Q. What was said then?

A. He said he was gonna get his wheat or Mr. Davis one. Said Kid Lilly killed a man and got away with it.

Q. What did he mean by that?

A. I donno.

Q. And you saw him Sunday night? What time?

A. About eight o'clock.

Q. Did you go with them on the truck to Mr. Davis?

A. Yes.

Q. Where did you get on the truck?

A. In front of my house.

Q. Who else was on it?

A. Cousin Archie, his mother, Buck Fitzgerald and myself.

Q. Where were you on the truck?

A. In front.

Q. Who was driving?

A. Buck Fitzgerald.

Q. Was there a gun in the truck?

A. I saw a shotgun in back of the truck.

Q. Did you get off before the truck stopped or not?
A. As soon as the truck stopped I got off.
Q. How far from Mr. Davis' house?
A. Five or ten yards.''

Henry Davis, a negro employee of Oscar Davis, testified as follows:

Q. ''Your name is Henry Davis?
A. Yes, sir.
Q. Where do you live?
A. Down at Oscar Davis'.
Q. How old are you?
A. Eighteen the 26th day of December.
Q. Were you down at Mr. Davis' the day he was shot?
A. Yes, sir.
Q. About what time was he shot?
A. Around six thirty.
Q. Who shot him?
A. Odell Waller.
Q. Did you see him shoot him?
A. Yes, sir. I was walking beside him.
Q. Beside who?
A. Mr. Oscar Davis.
Q. Just tell the jury exactly what happened from the time you got there until the shooting.

A. Odell come up there on a truck and Odell got out, spoke to Mr. Davis and said he come after his wheat. Mr. Davis said, 'After we finish threshing if I can't get nobody else I will get Henry to bring it' and we walked on towards the house. Mrs. Davis was fixing breakfast and then Odell shot him twice. I turn round like that and he shot at me.

Q. Then what happened.
A. I run in the house and told Mrs. Davis Odell had shot Mr. Davis and run down to the gear room and stopped and helped Mr. Davis back into the house.
Q. Then what
A. I went to Gretna for a doctor.
Q. Did Odell shoot any more?

A. Yes. He shot Mr. Davis to death—five times, shot Mr. Davis four times.

Q. He shot once at you and four times at Mr. Davis?

A. Four times he shot Mr. Davis.

Q. Did Mr. Davis do or say anything to Odell to cause him to shoot him?

A. No, sir. They didn't have any cross words.

Q. Did Mr. Davis have any knife or weapon on him?

A. No. No knife or nothing.

Q. Did you go over after Mr. Davis and help him?

A. I was out there and me and Mrs. Davis both asked if he wanted us to help him, but he said he didn't need no help.

Q. Did he have a weapon of any kind?

A. No, sir.

Q. Did he have a knife or pistol?

A. No, sir. Nothing.

Q. How do you know that?

A. Because he didn't. Mrs. Davis said he didn't even have any chewing tobacco, she told me he was going down to get some. He had changed his clothes.

Q. You say you told him Mrs. Davis said to come to breakfast?

A. Yes, sir.

Q. About how far were you from him when Odell shot Mr. Davis the first time?

A. I reckon twenty-five feet.

Q. Point out something.

A. As far as from here to that table (indicating the clerk's table).

Q. He had started in the house away from him?

A. Yes, sir, like this.

Q. Who else was at the shotoing

A. Aunt Annie, Uncle Archie, this boy on the truck.

Q. They were at the shooting?

A. No, just me and Odell and Mr. Davis.

Q. Just the three of you?

A. Yes, just the three of us.''

Mrs. Oscar Davis testified that on the morning of the tragedy she was in the "cook room" of the house; that when she heard the shooting she ran out in the yard where her husband was; that she led him into the house and helped undress him; that the only thing he had upon his person was a pocket book; that her husband had never owned a pistol.

It was further shown by the Commonwealth that the accused fled from the scene of the shooting and was arrested in Columbus, Ohio, on the third day of August, 1940. It is conceded that the only person present when Davis was shot were the accused and Henry Davis.

The case of the accused rests, in the main, upon his uncorroborated testimony. He denied having made threats against Oscar Davis. He admitted that he had, in addition to the pistol with which Davis was shot, a loaded shotgun in the truck. His explanation for having the shotgun was that he expected to go squirrel hunting.

The statement of the accused concerning the fatal occurrence is as follows:

"The 15th of July I went in and stopped and got out and went on to the house up in the yard—Henry was in the yard. When I walked up in the yard I said, 'Good morning', and he said 'Good morning.' I said, 'Mr. Davis, I come here to get my wheat.' Before he said anything, Henry spoke up and said, 'What you carry that wheat on? You can't carry it all on one trip.' Mr. Davis said I won't get that damn wheat away from here. I said, 'I got a truck.' He said, 'I told you you won't carry it away from here.' I told him I wouldn't of, and he used some dirty words, and from one word to another, and he usually carried a gun and run his hand in his pocket like he was trying to pull out something. I had my gun and out with it. I opened my pistol and commenced to shoot at him—I don't know how many times. I didn't look at it. Mr. Davis hollowed and fell. I went on down by the barn by the woods and stayed there until in the

evening. Then I come up to Joe Allen's house that night and his wife, she went to the window. I said, 'Where's Thomas at? Tell Thomas come here.' She went over to get him. He was all scared and said, 'Odell might as well go on and give up—four or five in a male posse with pistols, are after him.' I turned and went through the corn field.''

It is unnecessary to enter upon a discussion of the various degrees of murder as they are determined by statute. See Code section 4393 and notes thereto.

██ ██ The verdict of the jury having resolved all conflicts in the evidence against the accused, the pivotal question is, does the evidence of the Commonwealth sustain the verdict of murder in the first degree? The question must be answered in the affirmative. Here we have a case where an accused, after making threats against the life of his intended victim, proceeds to arm himself with a shotgun and pistol, goes to the home of his victim and, without any provocation, executes his previous threats by shooting his unarmed victim four times, twice in the back, as he walked away from him, and twice as he lay upon the ground. It is hard to conceive of a case where the elements of premeditation and malice stand out more prominently than they do in the case at bar.

In our opinion, the accused has had a fair and impartial trial, by an impartial jury; he has been convicted upon evidence adduced by members of his own race, which upon its face bears the impress of truth.

There is no error in the judgment of the trial court and it will be affirmed.

*Affirmed.*