**Salem**

DOCK HALL, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 1321-88-3

Decided April 2, 1991

Counsel

James J. Angel (Thomas L. Phillips, Jr.; Phillips, Phillips & Phillips, on brief), for appellant.

Richard A. Conway, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**KEENAN, J.**—Dock Hall appeals his convictions for murder, robbery and use of a firearm in the commission of both robbery and murder. He raises five issues on appeal: (1) whether the trial court erred in allowing the victim's wife to testify to statements made by the victim prior to his death under the dying declaration exception to the hearsay rule; (2) whether the trial court erred in allowing a prosecution witness to testify to facts recalled after undergoing hypnosis; (3) whether the trial court erred in refusing to grant the instructions on hypnosis tendered by Hall; (4) whether the trial court erred in refusing to strike a juror for cause; and (5) whether the appeal bond set by the trial court was excessive.

We hold that the statements made by the victim prior to his death were admissible under the dying declaration exception to the hearsay rule. We also hold that the trial court erred in admitting into evidence the testimony of a prosecution witness where the witness's recollection of events was altered by hypnosis. However, we find that this error was harmless in light of our finding that there was overwhelming competent evidence admitted to establish the same fact as that shown by the inadmissible testimony. In addition, we find that the trial court did not err in denying the proposed instructions on hypnosis since they did not accurately state the law and were not supported by the evidence. Further, we

find no error in the trial court's refusal to strike a juror for cause. Accordingly, the decision of the trial court is affirmed and we need not review whether the bond imposed pending appeal was excessive.

## I.

This appeal arises from a robbery which occurred at a Fisca Gas Station on Timberlake Road in Lynchburg on December 24, 1987. Prior to his death, Glenn West, the station manager, was able to describe the events in question. West was waiting for his wife to pick him up at approximately 8:00 p.m. that evening when he noticed a man walking across the station's driveway. West asked the man if he needed help. The man responded by asking for West by name, inquiring whether he was the manager and whether he was able to open the safe. West told the man that he was the manager but that he was unable to open the safe because it had a time-delay lock on it.

The man then told West to open the safe or he would kill him and pulled out a gun that West believed was either a .32 or .25 automatic. West begged the man not to shoot him, told him again that he was unable to open the safe, and offered him $50 cash that he had in his pocket. The man told West that he would have to kill him and shot him in the stomach. The man then ran across the street to the Fort Cinema.

West dialed 911 from inside the station at approximately 8:14 p.m. He was taken to the hospital, where his wife remained with him until he was taken into surgery. While at the hospital, West asked his wife to say a prayer for him and then requested a minister, although his wife testified that he was not a religious person. Shortly thereafter, he wished his wife a Merry Christmas. When she told him that she would save Christmas until he got home, West told her that he would not see Christmas. He told her to be strong and take care of their daughter as well as she could. He also told her where to find their Christmas presents in his office. Although Mrs. West begged him not to die and to come home for Christmas, West again responded no. When the minister arrived, West told him that he wanted to be saved.

West was taken into surgery within forty-five minutes of his arrival at the hospital. He came out of surgery at 2:10 a.m. and died

forty minutes later. The cause of death was determined to be a .25 caliber automatic gunshot wound to the abdomen.

Prior to undergoing surgery, West described his assailant as a young black man with short hair, 5'6" to 5'7," 160-170 pounds, no facial hair, and wearing a black jacket. In addition, he related to his wife and Officer McCane what had occurred at the station. He indicated that before he was attacked he saw a yellow van driving slowly up and down Timberlake Road. He recalled that the van had a sliding side door, a luggage rack on top, mag wheels and a CB antenna.

Several days later, Officer McCane received information that Diane Jones, an employee at the Fort Cinema, had some information about the robbery. McCane questioned Jones about the robbery on December 28, 1987. Jones told McCane that she had noticed a light yellow van with a luggage rack on top and a ladder at the rear parked under the Fort Cinema marquis, across the street from the Fisca station. She recalled that the van had colored lights circling its front license plate and that it was occupied by two males. Since she could not recall the license number, she agreed to undergo hypnosis to aid her recall.

Jones was hypnotized on December 29, 1987 by a clinical psychologist, Dr. Owens. The session lasted approximately one hour. Officer McCane accompanied Jones to the session and participated in it as an observer. Prior to the session, he told Owens that Jones had seen a light colored van which might be material to the police investigation. He did not, however, describe the van or give Owens the license number. Owens recorded the session, but the tape was for the most part inaudible.

Hall was arrested on January 22, 1988, and a search warrant was executed on a yellow Chevrolet van owned by James Ward which had a license number of HSV-828. Shortly thereafter, Jones contacted McCane and asked if he had the license number to the van. When McCane responded affirmatively, Jones asked him if the number was either HSV-828 or HSV-858, indicating that she had written those numbers down three hours after the session with Dr. Owens. She testified at a pre-trial hearing that at the time she called McCane she did not know that anyone had been arrested, although she was aware that people had been questioned and that the police had taken a van into custody. McCane

testified that the van's license number was contained in a police file to which he had access prior to the time that Jones was hypnotized and prior to the time she called him with the number.

Steve Johnson, a juvenile, testified at trial that he participated in the robbery of the Fisca Gas Station. He stated that several days before Christmas, he and Tracy Brown were at Hall's home. Hall asked them if they wanted to make some money by robbing the Fisca Station, but they said no. Johnson and Brown again discussed robbing the station with Hall on Christmas Eve and arrangements were made for Hall and James Ward to pick up Johnson and Brown at approximately 7:00 p.m. After Ward and Hall arrived in Ward's van, they drove to the home of another individual named Bowling.

Once Bowling joined them, Ward drove the group to the Fort Cinema on Timberlake Road to plan the robbery. Ward parked the van on the side of the theatre, and Hall and Bowling discussed the robbery. Hall suggested that Bowling call West by name in the hopes that West would open the safe without any trouble. Ward then gave Bowling a .25 automatic. Hall told Bowling that, if it became necessary, he should shoot West.

Bowling got out of the van and headed toward the gas station. Ward drove the van from the cinema to a nearby church parking lot. Bowling returned shortly thereafter and indicated that he was unable to rob the store because several customers were there.

Hall asked Bowling if he would try again and Bowling returned to the store. Meanwhile, Ward drove the van past the Fisca station several times. Finally, Ward returned to the church parking lot, where Bowling came running up to the van. Bowling threw forty-five dollars in cash onto a table in the van and told the others that he had to shoot West. He said that he did not get any more money because West had told him that the safe had a time lock on it.

Hall took back the gun and unloaded it. He then divided up the money, and Ward and Hall drove Johnson, Bowling and Brown home. The day after Christmas, Hall told Johnson and Brown not to worry about the robbery because the only witness was dead. He also told them not to say anything to the police.

## II.

■ The first question on appeal is whether the trial court erred in ruling that statements made by the deceased victim to his wife at the hospital prior to undergoing surgery were admissible under the dying declaration exception to the hearsay rule. It is well settled that in order for dying declarations to be admissible, "they must be shown to have been made when the declarant is under a sense of impending death, and without any expectation or hope of recovery." *Batten v. Commonwealth*, 190 Va. 235, 243, 56 S.E.2d 231, 235 (1949) (quoting *Bull v. Commonwealth*, 55 Va. (14 Gratt.) 613, 620 (1857)); *see also Waller v. Commonwealth*, 178 Va. 294, 306-07, 16 S.E.2d 808, 813 (1941), *cert. denied*, 316 U.S. 679 (1942); *Compton v. Commonwealth*, 161 Va. 980, 984, 170 S.E. 613, 615 (1933). The burden is on the Commonwealth to prove that the decedent possessed the requisite belief and mental attitude at the time the alleged declaration was made. *Batten*, 190 Va. at 243, 56 S.E.2d at 235.

In the case before us, West was shot in the abdomen at approximately 8:14 p.m. on Christmas Eve. He was taken to the hospital, where he remained for approximately one hour prior to undergoing surgery. During this time, West exhibited great pain and repeatedly told his wife that he would not see Christmas and that she and his daughter would have to carry on without him. At trial, West's wife testified that he was not a religious person. Notwithstanding this fact, West also asked to speak with a minister and told the minister that he wished to be saved. West died approximately six hours later from the gunshot wound. On this record, we find no error in the trial court's ruling that the statements made by West with respect to the shooting were admissible as dying declarations.

■ We are not persuaded by Hall's argument that the evidence of statements made by the emergency room personnel, suggesting that West's wound was minor and that he would recover subsequent to undergoing surgery, affects this determination. When considering the admissibility of dying declarations, the necessary element is a subjective one relating solely to the declarant's expectations. *Batten*, 190 Va. at 242, 56 S.E.2d at 234. Here, we find that the trial court did not err in finding that the evidence demonstrated West's sure belief in his impending death; the statements to the contrary made by others do not require a different result.

## III.

The next question we must address is whether the trial court erred in admitting the testimony of Diane Jones. Hall argues that because Jones' testimony was altered by hypnosis, she was incompetent to testify at trial, at least with respect to those matters recalled subsequent to undergoing hypnosis.

■ The Supreme Court first addressed the issue of the admissibility of hypnotically refreshed testimony in a criminal proceeding in *Greenfield v. Commonwealth*, 214 Va. 710, 715-16, 204 S.E.2d 414, 419 (1974). In that case, the court held that hypnotic evidence, either in the form of in-court testimony by a witness who was at that time hypnotized, or testimony as to what the person said while under hypnosis, is inadmissible. *Id.* at 716, 204 S.E.2d at 419.

Subsequently, in *Hopkins v. Commonwealth*, 230 Va. 280, 337 S.E.2d 264 (1985), *cert. denied*, 475 U.S. 1098 (1986), the court considered whether a witness whose memory had been restored or enhanced by prior hypnosis was competent to testify based on that recollection. Upon reviewing the rules adopted by other states with respect to the admissibility of post-hypnotic testimony, the court recognized the potentially dangerous effects of hypnosis on a witness's testimony. However, the court held that the testimony of the witness in *Hopkins* was admissible, since the witness testified only as to facts recalled and recorded prior to hypnosis, and the record showed that the witness's recollection had not been altered by hypnosis. The court specifically reserved judgment on the issue of whether the testimony of a witness whose recollection is altered or enhanced by hypnosis is incompetent as a matter of law. It is this issue which we must now decide.

Hall urges us to apply *Greenfield's* per se rule to hypnotically refreshed testimony on the grounds that such testimony is no more reliable than hypnotic evidence. The Commonwealth, on the other hand, contends that the issue is one of credibility rather than admissibility. Consequently, the Commonwealth maintains that the only issue is the weight to be afforded hypnotically refreshed testimony, an issue to be resolved by the finder of fact on a case-by-case basis.

■ Initially, we note that the United States Supreme Court has not addressed the issue of whether, in a criminal proceeding, the hypnotically refreshed testimony of a witness other than the defendant is admissible. That Court did, however, reject as unconstitutional a per se rule prohibiting the admission at trial of a defendant's hypnotically refreshed testimony on the grounds that such a rule created an arbitrary restriction on a defendant's right to testify at trial. *Rock v. Arkansas*, 483 U.S. 44, 61 (1987).[1]

Applying the reasoning utilized by the Supreme Court in *Rock*, the eleventh circuit concluded that neither the sixth amendment confrontation clause nor the fourteenth amendment due process right to a fair trial required a per se ban on the admission of hypnotically refreshed testimony. *Bundy v. Dugger*, 850 F.2d 1402, 1415 (11th Cir. 1988), *cert. denied*, 448 U.S. 1034 (1989). This holding is consistent with the holdings of other federal courts of appeal which have considered the applicability of a per se ban on the use of post-hypnotic testimony at trial. *See, e.g., Harker v. Maryland*, 800 F.2d 437, 438 (4th Cir. 1986); *Wicker v. McCotter*, 783 F.2d 487, 493 (5th Cir.), *cert. denied*, 478 U.S. 1010 (1986); *United States v. Kimberlin*, 805 F.2d 210, 219 (7th Cir. 1986), *cert. denied*, 483 U.S. 1023 (1987); *Clay v. Vose*, 771 F.2d 1, 3-5 (1st Cir. 1985), *cert. denied*, 475 U.S. 1022 (1986); *United States v. Adams*, 581 F.2d 193, 198-99 (9th Cir.), *cert. denied*, 439 U.S. 1006 (1978).

With respect to the sixth amendment analysis, the essential question is whether the criminal defendant had the opportunity for effective cross-examination. *Chaussard v. Fulcomer*, 816 F.2d 925, 929 (3d Cir.), *cert. denied*, 484 U.S. 845 (1987); *see also Bundy*, 850 F.2d at 1415; *Clay*, 771 F.2d at 4. As the fifth circuit noted in *United States v. Valdez*, 722 F.2d 1196 (5th Cir. 1984), the potential danger to this right is that "[o]nce a witness makes a recitation under hypnosis, his confidence in that supposed memory — whether genuine or invented — is greatly strengthened." *Id.* at 1202. Thus, "the witness's resultant undue confidence might violate the defendant's constitutional right to confront and cross-examine adverse witnesses. . . ." *Id.* However, as the eleventh circuit stated in *Bundy*, "although hypnosis may make effective

---

[1] In *Rock*, the court stated specifically: "This case does not involve the admissibility of testimony of previously hypnotized witnesses other than criminal defendants and we express no opinion on that issue." *Rock*, 483 U.S. at 58 n.15.

cross-examination more difficult, it does not always make it impossible." 850 F.2d at 1415; *see also Wicker v. McCotter*, 783 F.2d at 493. We agree with this reasoning and accordingly conclude that although the use of post-hypnotic testimony may in some circumstances violate a defendant's right to effective cross-examination, a per se ban on the use of such testimony is not required by the sixth amendment.

Hall does not argue, however, that the use of hypnotically refreshed testimony violates either his sixth or fourteenth amendment rights. Rather, he contends that because this type of testimony is inherently unreliable, that fact alone precludes its consideration by the jury.

The dangers inherent in the forensic use of hypnosis were outlined by the Supreme Court in *Hopkins*:

It is generally agreed that a person under hypnosis (1) is vulnerable to both conscious and unconscious suggestion, (2) may imagine details to fill gaps in his memory (confabulate) or intentionally fabricate facts to benefit himself or please the hypnotist, (3) may be unable to distinguish fact from fiction, both during and following hypnosis, and (4) may emerge from hypnosis with a strong subjective confidence in his subsequent recollection of the events recalled during hypnosis.

*Hopkins*, 230 Va. at 291, 337 S.E.2d at 271.[2]

To offset these dangers, federal and state courts alike have adopted varying methods to govern the use of hypnotically refreshed testimony at trial. Several of these courts have adopted a rule of per se admissibility, finding that the issue is one of credibility rather than admissibility, as advocated by the Commonwealth. *See, e.g., United States v. Awkard*, 597 F.2d 667, 669 (9th Cir.), *cert. denied*, 444 U.S. 885 (1979); *United States v. Adams*, 581 F.2d at 199; *State v. Brown*, 337 N.W.2d 138, 151 (N.D. 1983); *Pearson v. State*, 441 N.E.2d 468, 473 (Ind. 1982); *Chapman v. State*, 638 P.2d 1280, 1284 (Wyo. 1982); *State v.*

---

[2] For a detailed analysis of the problems associated with posthypnotic recall. *See State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 183-87, 644 P.2d 1266, 1269-73 (1982); *People v. Shirley*, 31 Cal. 3d 18, 57-62, 723 P.2d 1354, 1377-81, *cert. denied*, 459 U.S. 860, 181 Cal. Rptr. 243, 266-70 (1982).

*Glebock*, 616 S.W.2d 897, 903 (Tenn. Crim. App. 1981). Others have determined that hypnotically refreshed testimony is per se admissible so long as the hypnosis session is conducted in accordance with specific guidelines. *See, e.g., Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1122-23 (8th Cir. 1985), *cert. denied*, 475 U.S. 1046 (1986); *State v. Hurd*, 86 N.J. 525, 545-46, 432 A.2d 86, 96-97 (1981); *State v. Beachum*, 97 N.M. 682, 689-90, 643 P.2d 246, 252 (Ct. App. 1981). Still others have concluded that the trial court must determine on a case-by-case basis, after consideration of the totality of the circumstances, whether the testimony of a previously hypnotized witness is sufficiently reliable to be admissible. *See, e.g., People v. Romero*, 745 P.2d 1003, 1016 (Colo. 1987), *cert. denied*, 485 U.S. 990 (1988); *Zani v. State*, 758 S.W.2d 233, 244 (Tex. Crim. App. 1988).

The majority of courts, however, has concluded that the dangers inherent in any hypnosis session, even a properly conducted one, are too great to allow the use of hypnotically refreshed testimony at trial. These courts have adopted a per se rule of inadmissibility with respect to the hypnotically refreshed testimony of a witness. *See, e.g., State ex rel. Neely v. Vogt*, 165 Ariz. 508, 799 P.2d 849, 854 (1990); *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 208-09, 644 P.2d 1266, 1294-95 (1982); *People v. Lee*, 434 Mich. 59, 74, 450 N.W.2d 883, 890, *cert. denied*, 111 S. Ct. 211 (1990); *People v. Gonzales*, 415 Mich. 615, 626-27, 329 N.W.2d 743, 748 (1982); *People v. Zayas*, 131 Ill. 2d 284, 295, 546 N.E.2d 513, 518 (1989); *State v. Tuttle*, 780 P.2d 1203, 1211 (Utah 1989), *cert. denied*, 494 U.S. 1018 (1990); *Contreras v. State*, 718 P.2d 129, 130 (Alaska 1986); *Bundy v. State*, 471 So. 2d 9, 18 (Fla. 1985), *cert. denied*, 479 U.S. 894 (1986); *State v. Haislip*, 237 Kan. 461, 482, 701 P.2d 909, 926, *cert. denied*, 474 U.S. 1022 (1985); *State v. Moreno*, 68 Haw. 233, 236, 709 P.2d 103, 105 (1985); *State v. Peoples*, 311 N.C. 515, 531-32, 319 S.E.2d 177, 188 (1984); *State v. Martin*, 101 Wash. 2d 713, 714, 684 P.2d 651, 652 (1984); *Robison v. State*, 677 P.2d 1080, 1085 (Okla. Crim. App.), *cert. denied*, 467 U.S. 1246 (1984); *People v. Hughes*, 59 N.Y.2d 523, 545, 453 N.E.2d 484, 495, 466 N.Y.S.2d 255, 266 (1983); *State v. Patterson*, 213 Neb. 686, 690, 331 N.W.2d 500, 503 (1983); *State v. Palmer*, 210 Neb. 206, 218, 313 N.W.2d 648, 655 (1981); *Commonwealth v. Kater*, 388 Mass. 519, 526, 447 N.E.2d 1190, 1197 (1983); *State v. Collins*, 296 Md. 670, 702, 464 A.2d 1028, 1044 (1983); *People v. Shir-*

*ley*, 31 Cal. 3d at 66, 723 P.2d at 1384, 181 Cal. Rptr. at 273, *modified by People v. Hayes*, 49 Cal. 3d 1260, 1273, 783 P.2d 719, 727, 265 Cal. Rptr. 132, 140 (1989); *State v. Koehler*, 312 N.W.2d 108, 110 (Minn. 1981).

This rule of per se inadmissibility is based on a finding that hypnotically refreshed testimony does not meet the standard for admissibility of scientific evidence enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), or some similar "general acceptance" standard. *See, e.g., State v. Peoples*, 311 N.C. at 530, 319 S.E.2d at 187. Under *Frye*, expert testimony deduced from a scientific principle or discovery is inadmissible unless its proponent establishes that the principle or discovery from which the deduction is made has gained acceptance in the particular field within the scientific community in which it belongs. While hypnotically refreshed testimony is not "scientific evidence" per se, since the testimony in question is that of a lay witness rather than an expert opinion, it has been generally held that the *Frye* analysis is equally applicable to hypnotically refreshed testimony, because the testimony given by the lay witness is the product of scientific intervention. *See State v. Tuttle*, 780 P.2d at 1211; *State ex rel. Collins v. Superior Court*, 132 Ariz. at 197-98, 644 P.2d at 1284-85 (1982). Although the Virginia Supreme Court has not adopted *Frye* as the appropriate standard for evaluating the admissibility of scientific evidence, *O'Dell v. Commonwealth*, 234 Va. 672, 696, 364 S.E.2d 491, 504, *cert. denied*, 488 U.S. 871 (1988), it repeatedly has predicated the admissibility of scientific evidence on a finding of reliability. *See, e.g., Spencer v. Commonwealth*, 238 Va. 275, 290, 384 S.E.2d 775, 783 (1989), *cert. denied*, 493 U.S. 1036 (1990) (DNA testing admissible because evidence establishes that it is a reliable scientific technique); *O'Dell v. Commonwealth*, 234 Va. at 695-97, 364 S.E.2d at 504-05 (electrophoresis blood testing admissible because reliable and generally accepted in the field of forensic science); *Lee v. Commonwealth*, 200 Va. 233, 237, 105 S.E.2d 152, 155 (1958) (lie detector test results inadmissible because such tests generally have not been proved scientifically reliable).

In the case before us, Hall did not present expert testimony at trial challenging the reliability of hypnosis, in spite of the trial court's ruling that expert testimony would be permitted. The Commonwealth also did not provide extensive expert testimony on

the reliability of hypnotically refreshed testimony or its acceptance in the scientific community as a reliable means of restoring memory, although Dr. Owens was qualified as an expert in hypnosis. Thus, the record before us is sparse in terms of opinion evidence regarding the reliability or unreliability of hypnotically refreshed testimony.

In *Hopkins*, however, the Supreme Court recognized that "[t]he one certainty that emerges from the mass of expert opinion . . . is that manipulation of the mind through hypnosis may lead to uncertain and unreliable results." 230 Va. at 291, 337 S.E.2d at 271; *see also State v. Tuttle*, 780 P.2d at 1210 ("[a]t the present time, the inherent unreliability of such testimony is well established by [case law and journal articles]. . ."). Dr. Owens specifically testified at the pre-trial hearing about one of the potential dangers associated with hypnosis outlined in *Hopkins*, namely that individuals who have been placed under hypnosis tend to remember facts which are not accurate. Dr. Owens testified that as a result, information obtained through use of hypnosis needed to be independently verified in order to ensure its accuracy.

■ Upon consideration of this record and the applicable case law in this jurisdiction and others, we are persuaded by the majority rule that hypnotically refreshed testimony should be subject to a per se rule of exclusion. Accordingly, we hold that in a criminal trial, a witness other than the defendant, who has been hypnotized prior to trial is, as a matter of law, incompetent to testify as to those facts or circumstances which the witness recalled for the first time during, or subsequent to, hypnosis.

■ We also hold that the mere fact that a witness has been hypnotized does not make that witness incompetent to testify as to all matters related to the hypnosis session. As the New York Court of Appeals noted in *People v. Hughes*, 59 N.Y.2d at 545, 453 N.E.2d at 495, 466 N.Y.S.2d at 266: "A criminal trial for rape or assault would present an odd spectacle if the victim was barred from saying anything, including the fact that the crime occurred, simply because he or she submitted to hypnosis sometime prior to trial to aid the investigation or obtain needed medical treatment." Moreover, hypnosis has proven to be an effective investigative technique. *See* Reiser, *Hypnosis as an Aid in a Homicide Investigation*, 17 Am. J. Clinical Hypnosis 84 (1974); *State ex rel. Collins v. Superior Court*, 132 Ariz. at 206, 644 P.2d at

1292. Thus, "[a]s a practical matter, if we are to maintain the rule of incompetency, the police will seldom dare to use hypnosis as an investigatory tool because they will thereby risk making the witness incompetent if it is later determined that the testimony of that witness is essential." *State ex rel. Collins v. Superior Court*, 132 Ariz. at 209, 644 P.2d at 1295.

We believe that the appropriate way to resolve these competing interests is to adopt the majority rule and permit a witness who has undergone hypnosis to testify as to those events recalled prior to undergoing hypnosis so long as this pre-hypnotic recall has been adequately documented. *Accord State ex rel. Neely v. Vogt*, 165 Ariz. at 508, 799 P.2d at 854; *State ex rel. Collins v. Superior Court*, 132 Ariz. at 209, 644 P.2d at 1295; *People v. Lee*, 434 Mich. at 72, 450 N.W.2d at 889; *People v. Nixon*, 421 Mich. 79, 90, 364 N.W.2d 593, 599 (1984); *People v. Zayas*, 131 Ill. 2d at 297, 546 N.E.2d at 519; *People v. Hayes*, 49 Cal. 3d at 1273, 783 P.2d at 727, 265 Cal. Rptr. at 140; *State v. Tuttle*, 780 P.2d at 1211; *Contreras v. State*, 718 P.2d at 139; *Bundy v. State*, 471 So. 2d at 18; *Elliotte v. State*, 515 A.2d 677, 681 (Del. 1986); *State v. Haislip*, 237 Kan. at 482, 701 P.2d at 926; *State v. Moreno*, 68 Haw. at 236, 709 P.2d at 105; *State v. Peoples*, 311 N.C. at 533, 319 S.E.2d at 188; *State v. Martin*, 101 Wash. 2d at 714, 684 P.2d at 652; *People v. Hughes*, 59 N.Y.2d at 545, 453 N.E.2d at 495, 466 N.Y.S.2d at 266; *State v. Patterson*, 213 Neb. at 692, 331 N.W.2d at 504; *Commonwealth v. Kater*, 388 Mass. at 528, 447 N.E.2d at 1197; *State v. Collins*, 296 Md. at 702, 464 A.2d at 1044; *State v. Koehler*, 312 N.W.2d at 110.[3] In addition, we hold that the burden is on the party offering the testi-

---

[3] Arizona and California were the only two states to adopt a rule of per se inadmissibility governing all testimony of a witness who had undergone hypnosis. *See State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981); *People v. Shirley*, 31 Cal. 3d 18, 66, 723 P.2d 1354, 1384, 181 Cal. Rptr. 243, 273 (1982). The *Mena* decision was modified the following year to allow a witness to testify to those events demonstrably recalled and related prior to undergoing hypnosis. *State ex rel. Collins v. Superior Court*, 132 Ariz. at 209, 644 P.2d at 1295.

The *Shirley* decision was modified by California Evidence Code § 795, which was adopted in 1985. This code section permits the introduction of testimony by a witness who has undergone hypnosis, so long as the testimony is limited to matters recalled and related in accordance with specified safeguards prior to hypnosis. In addition, in *People v. Hayes*, 49 Cal. 3d 1260, 783 P.2d 719, 265 Cal. Rptr. 132 (1989), the California Supreme Court adopted a similar standard with respect to the admissibility of pre-hypnotic evidence predating the effective date of Code § 795. In *Hayes*, the court held that a "witness is permit-

mony about a witness's pre-hypnotic recollections to show that the testimony was both recalled and related to someone prior to the hypnosis session.

■ Furthermore, to ensure the reliability of a witness's testimony with respect to his pre-hypnotic recall, we recommend that the hypnotic session be conducted in accordance with the guidelines set forth in *State v. Hurd*, 86 N.J. 525, 543-46, 432 A.2d 86, 96-97 (1981).[4] We are persuaded that the reliability of a witness's testimony with respect to events recalled prior to undergoing hypnosis is enhanced when these guidelines are followed. However, we decline to require strict adherence to these guidelines as an absolute prerequisite to the admissibility of testimony concerning events recalled prior to the hypnotic session. A party may be able to demonstrate by expert testimony that even though all of the *Hurd* safeguards have been followed, the witness's memory has been so irreparably distorted by hypnosis that that witness is incompetent to testify. On the other hand, even if the hypnosis procedures are flawed, a trial court may find that a witness's testimony was given independent of the dangers associated with hypnosis and is therefore reliable. *See McQueen v. Garrison*, 814 F.2d 951, 958 (4th Cir.), *cert. denied*, 484 U.S. 944 (1987); *Commonwealth v. Kater*, 388 Mass. at 529-30, 447 N.E.2d at 1197-98. Thus, it remains within the sound discretion of the trial court to determine whether the witness's testimony as to those events

---

ted to testify to events that the trial court finds that the witness both recalled and related to others before undergoing hypnosis." *Id*. at 1273, 783 P.2d at 727, 265 Cal. Rptr. at 140.

⁴ The Supreme Court of New Jersey adopted the following procedural requirements:

[1]. [A] psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. . . .

[2]. [T]he professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

[3]. [A]ny information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. . . .

[4]. [B]efore inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

[5]. [A]ll contacts between the hypnotist and the subject must be recorded. . . . The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.

[6]. [O]nly the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.

*Hurd*, 86 N.J. at 543-46, 432 A.2d at 96-97 (footnote omitted).

recalled prior to undergoing hypnosis has been so tainted as a result of the hypnosis procedure utilized as to be inadmissible. *See Hopkins*, 230 Va. at 291-92, 337 S.E.2d at 271; *Elliotte*, 515 A.2d at 681; *State v. Haislip*, 237 Kan. at 483, 701 P.2d at 926.

■ Once a witness has been found competent to testify about matters recalled and related prior to hypnosis, opposing counsel has the option of introducing evidence that the witness has undergone hypnosis. *See State v. Martin*, 101 Wash. 2d at 722, 684 P.2d at 656. Counsel also can make inquiry into the process itself and its potential effect on the witness's recollection through both cross-examination of the witness and the use of expert testimony. *See People v. Hughes*, 59 N.Y.S. at 548, 453 N.E.2d at 497, 466 N.Y.S.2d at 267-68.

Applying these standards to the case before us, we find initially that Jones' testimony was refreshed by hypnosis. Officer McCane testified that on December 28, 1987, Jones told him that she had seen a light yellow van with a luggage rack on top and a ladder at the rear parked near the marquis at the Fort Cinema. The van had colored lights circling the license plate and was occupied by two males. McCane recorded this information in his notes. He made no notations with respect to the van's license number.

Jones was hypnotized on December 29, 1987. While under hypnosis, Jones described the van as a pale yellow Ford with round headlights, mag wheels, a sliding side door and a small round side window. She indicated that the van had a ladder in the back which led to the roof and a tire which was covered by a black tire cover. She described the tires as having jagged treads. Three hours after undergoing hypnosis she recalled the license number of the van as HSV-858.

At trial, Jones testified that on December 24, 1987 she saw a yellow van with sporty mag wheels, a chrome ladder and black wheel cover in the back, sitting underneath the marquis at the Fort Cinema. The van had its headlights off; however, the engine was running. The van was occupied by two people and had colored lights around the license plate. Jones also testified that three hours after undergoing hypnosis she recalled that the license number of the van was HSV-858. She indicated that the picture of the van belonging to James Ward differed from the van she had seen in

that a small side window and the side pin stripes had been puttied over and the ladder and wheel cover were missing from the back of the van.

Because Jones testified to events that were not recalled and related prior to undergoing hypnosis, admission of this testimony was error.

With respect to Jones' pre-hypnotic recall, the trial court specifically found that Jones was competent to testify and that her recollections were neither induced nor tainted by hypnosis. From the record before us, it is apparent that the Commonwealth was unable to provide an audible audio or video recording or a transcript of the hypnosis session which would have allowed the trial court to review whether Jones was subjected to improper suggestion during the session. However, both Dr. Owens, a clinical psychologist, who was qualified by the trial court as an expert in hypnosis, and Officer McCane testified in a pre-trial hearing about what transpired during the session and were extensively examined with respect to the dialogue between Dr. Owens and Jones.

During this exchange, Owens testified that prior to hypnotizing Jones, he obtained a baseline description of what she had seen. He then hypnotized Jones by using an eye roll technique which caused her to relax. Once Jones was hypnotized, Owens initially utilized a spontaneous recall procedure. Owens testified that this procedure included giving Jones various choices in an attempt to spark recognition. He indicated that he asked Jones whether the van was light or dark, striped or unstriped and whether the van had square or round headlights. During this portion of the hypnosis session, Owens testified that Jones told him that the van was a pale yellow Ford without stripes with a port hole door near the back on the driver's side, and a customized wheel in the back which had a black covering.

Owens then had Jones freeze the memory of the van in her mind and approach it from the front, the sides and the back. Owens testified that while Jones was remembering the back of the van, she identified a ladder, a continental kit[5] and several other unspecific characteristics.

[5] Owens indicated at the hearing that a continental kit was "one of those suspended wheels."

With respect to the license plate, Owens testified that he followed a standard procedure, whereby he recited numbers and letters sequentially to Jones and had her raise a finger at those which applied. Owens testified that he did not recall her response to this procedure. He indicated that his notes were sketchy because the results were recorded on the tape, and that all he could read was a "zero eight" question mark and an "M" question mark but could not recall the significance of these notations. Finally, Owens testified that he did not tell Jones anything about the description of the van except those details which Jones supplied herself.

Officer McCane testified that while under hypnosis, Jones described the van as pale yellow with round headlights and mag wheels, possibly a Ford, with a sliding side door, a small round side window, a ladder leading to the roof at the rear and a tire covered with a black tire cover. McCane also testified that Jones raised her finger in response to the letter "H" and the number "8" and that he noticed motion at the letter "J" and the number "5."

McCane testified that the primary purpose for having Jones undergo hypnosis was to obtain the license number of the van. He indicated that he had a description of Ward's vehicle and its license number in an investigative file pertaining to the case, along with similar information on thirty or forty other vans. He stated that at the time Jones was hypnotized, the information on Ward's van was not remarkable and he had not taken detailed notice of it. He testified that prior to the session, he told Dr. Owens that Jones had seen a light colored van, but that he did not describe the van or provide a license number.

McCane stated that he participated in the hypnosis session as an observer and did not say anything or recount anything during the session. In addition, he testified that he did not give any information about Ward's van to either Owens or Jones prior to the hypnosis session. Finally, McCane testified that he did not mention to Jones anything about West's statements in relation to seeing a van. Although this hypnosis procedure complied only partially with the guidelines outlined in *Hurd*, upon review of the evidence presented to the trial court at the pre-trial hearing, we find that the trial court did not abuse its discretion in finding Jones competent to testify about the facts she recalled and related prior to undergoing hypnosis.

The next issue we must address is whether Hall is entitled to a new trial as a result of the trial court's admission of Jones' post-hypnotic recall. As a panel of this court stated in *Williams v. Commonwealth*, 4 Va. App. 53, 354 S.E.2d 79 (1987), "[a] conviction should not be reversed unless the introduction of improper evidence suggests a manifest probability that it was prejudicial to the defendant." *Id.* at 74, 354 S.E.2d at 91 (quoting *Boykins v. Commonwealth*, 210 Va. 309, 313, 170 S.E.2d 771, 774 (1969)); *see also Rider v. Commonwealth*, 8 Va. App. 595, 600, 383 S.E.2d 25, 27 (1989). Thus, where the fact sought to be established by the admission of improper evidence is also overwhelmingly established by competent evidence, the error is harmless. *Williams*, 4 Va. App. at 74, 354 S.E.2d at 91.

In the case before us, the inadmissible testimony included a more detailed description of the van and the license number of the van. At trial, Officer Brown testified that he took photographs of a yellow van on January 24, 1988. The van bore the license number HSV-828 and was registered to James Ward. Steve Johnson, a co-defendant, testified that the van in the photographs taken by Brown was the van used in the robbery. Johnson also testified that the body putty on the van in the photographs was not on the van the night of the robbery. Officer Royal testified that he stopped a yellow van with the license tag HSV-828 on December 25, 1987. He testified that the van had a silver ladder rack on the back and a black leather wheel cover and that there was no body putty on the driver's side of the van. Officer McDaniel testified that he followed a yellow van with the license number HSV-828 on December 26, 1987. McDaniel described the van as having a ladder in the rear and blinking lights around the license tag. He stated that there was no body putty on the van on December 26, 1987.

In addition, the description of the van given by the victim, Glenn West, to Officer McCane included the fact that the van had mag wheels. The description Jones gave of the van prior to undergoing hypnosis closely matched the description West gave to McCane, as well as the pictures of the van taken by the police after it was seized from James Ward. Based on this record, we find that there was overwhelming competent evidence to support the jury's finding that the van seized from James Ward was the van used in the robbery. Accordingly, we hold that the admission of Jones' hypnotically refreshed testimony was harmless error.

## IV.

We also find no error in the trial court's refusal to grant the instructions proffered by Hall regarding hypnosis. An appellate court's responsibility in reviewing jury instructions is "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Swisher v. Swisher*, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982). Instruction C-3,[6] which was originally drafted by the trial court and then offered by Hall, was an incorrect statement of the law, and therefore Hall was not entitled to the instruction. Instruction M,[7] although following language in the *Hopkins* case, was not supported by any evidence offered at trial. Hall did not call an expert witness to testify as to the dangerous effects of hypnosis, even though the trial court specifically informed Hall that such testimony would be permitted. In addition, Dr. Owens, the hypnotist, was not called to testify at trial about either the procedures utilized or the likelihood of suggestion during the hypnosis session. On this record, we find that the trial court did not err by refusing to grant Hall's proffered instructions.

## V.

Finally, we find that the trial court did not err by refusing to strike juror Judd for cause. " 'The partiality or impartiality of an individual juror is a factual issue best determined by the trial court.' Its finding that a juror can be impartial is 'entitled to great weight and should be set aside only for plain error.' " *Foster v. Commonwealth*, 6 Va. App. 313, 330, 369 S.E.2d 688, 698 (1988) (quoting *Watkins v. Commonwealth*, 229 Va. 469, 480, 331 S.E.2d 422, 431 (1985), *cert. denied*, 475 U.S. 1099 (1986)). In the case before us, the juror indicated during *voir dire* that he had

---

[6] Instruction C-3 reads as follows: The Court instructs the jury that in weighing the testimony of Diane Jones, you are entitled to consider the fact that she was subjected to hypnosis as she described it. If you think that her testimony or any part thereof was a result of hypnosis and not a result of her independent recollection of events, then you may disregard such testimony.

[7] The Court instructs the jury that manipulation of the mind through hypnosis may lead to uncertain and unreliable results. A person under hypnosis is vulnerable to both conscience [sic] and unconscience [sic] suggestions, may imagine details to fill doubts in memory or intentionally fabricate things to benefit herself or to please the hypnotist, may be unable to distinguish fact from fiction, both during and following hypnosis, and may emerge from hypnosis with a strong subjective confidence in her subsequent recollection of the events recalled during hypnosis.

worked with Mrs. West for four years and knew her fairly well. He also stated that he had met the decedent through his working relationship with Mrs. West.

Counsel for the defendant then asked the following question:

If you sat on the case, and if the Commonwealth could not convince you that Dock Hall was guilty, would that cause you some concern to sit on a jury that would have voted to acquit someone that was accused of robbery and murder of a friend of yours?

The juror responded:

I think that, I think I could be fair. I can tell you that it would probably bother me. I've seen the devastating effects it's had on the family and all. You can't just forget that.

The court then asked an additional question:

[D]o you feel that you could put aside what you know about the case and decide the case solely on the basis of the law and the evidence; or do you feel that your decision in the case would or might be affected by outside influences?

The juror responded:

Your Honor, I don't think it would be affected by outside influences. I think I could put that aside. I just said earlier that I might find it difficult. I didn't say I couldn't do it. But in all honesty, there is a feeling here; but I think that I would be able to be objective.

This record shows that in response to questions posed by both defense counsel and the court, the juror stated that he was able to be objective and fairly decide the case. Although he did admit that if the jury decided to acquit the defendant, such a result would bother him because of his familiarity with the family, he at no time indicated that he was leaning toward either conviction or acquittal, or that he would not be able to decide the case impartially. *See Educational Books, Inc. v. Commonwealth*, 3 Va. App. 384, 387, 349 S.E.2d 903, 906 (1986). Instead, he repeatedly stated that he could be impartial and put aside outside influences.

On this record, we find that the trial court's refusal to strike the juror for cause was not error.

For the reasons stated, the decision of the trial court is accordingly affirmed.

*Affirmed.*

Koontz, C.J., and Moon, J., concurred.